INTERNATIONAL TELEPHONE & TELEGRAPH
CORP., COMMUNICATIONS EQUIPMENT
& SYSTEMS DIVISION *v.* LOCAL 134,
INTERNATIONAL BROTHER-
HOOD OF ELECTRICAL
WORKERS, AFL–CIO,
ET AL.

No. 73–1313.   Argued November 19, 1974—
Decided January 14, 1975

Rehnquist, J., delivered the opinion for a unanimous Court.

*Matthew E. Murray* argued the cause for petitioner. With him on the brief was *John D. O'Brien.*

*Robert E. Fitzgerald, Jr.,* argued the cause for respondent Local 134, International Brotherhood of Electrical

Workers. With him on the brief was *Edward J. Calihan, Jr.* *Norton J. Come* argued the cause for respondent National Labor Relations Board in support of petitioner. With him on the brief were *Solicitor General Bork, Peter G. Nash, John S. Irving,* and *Patrick Hardin.* *Charles V. Koons, Irving M. Friedman,* and *Harold A. Katz* filed a brief for respondent Communications Workers of America in support of petitioner.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

In 1947 Congress responded to the labor unrest caused by jurisdictional disputes by adding § 8 (b)(4)(D) to the National Labor Relations Act, which made it an unfair labor practice for a labor organization to induce the employees of any employer to strike in the hopes of forcing an employer to assign particular work to employees in a particular labor organization.[1] In the belief

---

[1] Labor Management Relations Act, 1947, 61 Stat. 141, as amended by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 542, § 8 (b)(4)(D), 29 U. S. C. § 158 (b)(4)(D), presently provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is

that resolution of jurisdictional disputes was more important to industrial peace than the imposition of unfair labor practice sanctions, *NLRB* v. *Radio Engineers*, 364 U. S. 573, 576–577 (1961) (hereinafter *CBS*), Congress at the same time enacted § 10 (k), 29 U. S. C. § 160 (k),[2] to induce unions to settle their differences without awaiting unfair labor practice proceedings and enforcement of Board orders by courts of appeals.

One year earlier Congress had responded to the many expressed concerns for fairness and regularity in the administrative process summarized in *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 36–41 (1950), by enacting the Administrative Procedure Act (Act).[3] Section 5 of that Act, now 5 U. S. C. § 554, establishes requirements governing certain agency proceedings that come within the Act's definition of "adjudication." We granted certiorari to the Court of Appeals for the Seventh Circuit in this

---

failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work."

[2] Title 29 U. S. C. § 160 (k) provides:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158 (b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

[3] 60 Stat. 237, as codified by an Act to enact Title 5, United States Code, 80 Stat. 378. Slight modifications in the Act sections under consideration in this case were made at the time of codification, but no substantive changes were intended. H. R. Rep. No. 901, 89th Cong., 1st Sess., 3 (1965); S. Rep. No. 1380, 89th Cong., 2d Sess., 18 (1966).

case, 416 U. S. 981 (1974), to review its conclusion that 5 U. S. C. § 554 applied to a § 10 (k) proceeding conducted by the Board, 486 F. 2d 863 (1973). Another Court of Appeals had decided a short time earlier that such a Board proceeding was not subject to § 554, *Bricklayers* v. *NLRB*, 155 U. S. App. D. C. 47, 475 F. 2d 1316 (1973).

The case now before us arose out of a jurisdictional dispute between respondent Local 134 of the International Brotherhood of Electrical Workers (IBEW) (hereafter respondent) and the Communications Workers of America (CWA) over whose members would perform certain telephone installation work in Cook County, Ill. Petitioner International Telephone & Telegraph Corp., which had a nationwide collective-bargaining agreement with the CWA, had established a communications equipment and systems division to sell and install private telephone systems.[4] In 1970 petitioner entered into a contract with the village of Elk Grove, Ill., for the installation and sale of a switching system and related telephone and circuitry work. Since employees of the Illinois Bell Telephone Co., who were members of respondent, had already run trunklines from the local operating telephone system to the Administrative Office of the village, petitioner's contract covered only the remaining two stages necessary to complete installation of the system. First the telephone cable had to be routed from the telephone room in the basement to the telephone instruments in particular rooms and offices by a process known as "pulling cable"; petitioner subcontracted this work to the C. A. Riley Electric Construction Co.,

---

[4] The division was organized to take advantage of a ruling by the Federal Communications Commission that private telephone systems could be interconnected with an operating telephone company system. *Use of the Carterfone Device in Message Toll Telephone Service,* 13 F. C. C. 2d 420 (1968).

whose employees are represented by respondent. Second, by a process known as "terminating the cable," the cable would be connected to the telephone instruments. Petitioner planned to have its own technicians, who were represented by the CWA, perform this work.

C. A. Riley had hoped to perform the terminating work and inquired of petitioner's supervisor whether that was possible. The supervisor informed Riley of petitioner's plan to have its own employees do the work, and Riley told the supervisor that petitioner's representatives had better meet with the business agent of respondent. On two occasions petitioner's representatives met with the union business agent, who told them that respondent installed all telephone equipment in Cook County and that CWA members would install no telephone equipment in Cook County. On the second occasion the respondent's business agent was quite explicit: "We'd better get that work or there will be trouble." [5]

When CWA employees appeared at the jobsite on December 3, 1970, to begin their portion of the work, all of respondent's members left their jobs.[6] That after-

---

[5] 197 N. L. R. B. 879, 881 (1972).

[6] The respondent's business agent had been notified the previous evening that petitioner's employees would begin their work on December 3. When petitioner's two employees reported to the basement telephone room for work, two of respondent's members, who were employed by the Illinois Bell Telephone Co., packed up their tools and left because they would not work with CWA members. Respondent's steward entered the room and demanded to see petitioner's employees' union cards. When they could not produce Local 134 membership cards, the steward announced, "I can't work here" or "we can't work here." Ibid. After this comment, four or five employees of the Johnson Electric Co., who also were members of Local 134, drifted away. At a coffee break a few moments later, the steward told all the assembled members of Local 134 that he was going home because he did not want to work with "nonunion" men.

noon a representative of the village of Elk Grove met with petitioner's regional sales manager, and they agreed to pull petitioner's employees off the job temporarily. Representatives of respondent were informed, and all Local 134 employees thereafter returned to work.[7]

On December 3, 1970, petitioner filed a charge alleging that respondent had violated § 8 (b)(4)(D) of the National Labor Relations Act, 29 U. S. C. § 158 (b)(4)(D). The Board's Regional Director found reasonable cause to believe that the charge had merit and proceeded in accordance with the language of § 10 (k):

> "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158 (b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed." 29 U. S. C. § 160 (k).

Respondent was notified that a hearing would be conducted by a hearing officer[8] upon the dispute alleged in

The other Local 134 members also left the jobsite at that time, and none worked on the job for the rest of the day.

[7] Petitioner's employees remained off the job until December 21, at which time they returned and performed the terminating work. Respondent's members, who had worked on the project as employees of Riley, Illinois Bell, and the Johnson Electric Co., had completed their work by December 21 so that no second confrontation occurred.

[8] The Board's regulations provided that a "hearing officer" is

the charge, and the hearing was held on March 12, 15, and 17, 1971, with Stephen S. Schulson, an attorney in the regional office, presiding. All parties appeared at the hearing and were given full opportunity to be heard, to examine and cross-examine witnesses, and to adduce evidence bearing on the issues. In accordance with NLRB regulations, the record was transmitted to the Board for decision without any recommendation from the hearing officer.[9] The Board received briefs from petitioner, respondent, and the CWA, and concluded that employees represented by the CWA were entitled to perform the work in dispute. 191 N. L. R. B. 828 (1971). On August 30, 1971, respondent notified the Regional Director that it would not comply with the Board's § 10 (k) determination. The Regional Director, on behalf of the Board's General Counsel, then issued a complaint upon the § 8 (b)(4)(D) unfair labor practice charge that had been held in abeyance pending the attempt to resolve the dispute pursuant to the § 10 (k) proceeding. At the hearing before a trial examiner, the General Counsel was represented by the same attorney who had presided over the compilation of testimony for

"the agent of the Board conducting the hearing in a proceeding under section 9 or in a dispute proceeding under section 10 (k) of the act." 29 CFR § 102.6 (1971). A hearing officer "normally is an attorney or field examiner attached to the regional office but may be another qualified official." 29 CFR § 101.20 (c). The "hearing officer" is to be distinguished from a "trial examiner," who presides over unfair labor practice proceedings. 29 CFR § 102.6. The Board's current regulation is identical to the regulation in force at the time of the § 10 (k) proceeding of the present case except that the term "trial examiner" has been changed to "administrative law judge," 29 CFR § 102.6 (1974). See 37 Fed. Reg. 16787 (1972).

[9] The Board's regulations, 29 CFR § 101.34, require the hearing officer to transmit the record to the Board but provide that he shall make "no recommendations in regard to resolution of the dispute."

the Board in the § 10 (k) proceeding. The trial examiner concluded that respondent had violated § 8 (b)(4)(D) and he recommended that it be ordered to cease its unlawful conduct; exceptions were filed with the Board [10] which it overruled in ordering respondent to cease and desist from its unlawful conduct. 197 N. L. R. B. 879 (1972).

Respondent filed a petition to review and set aside the Board's order in the Court of Appeals for the Seventh Circuit, and the Board filed a cross-application for enforcement of its order.[11] The Court of Appeals found respondent's conduct to be "the very activity § 8 (b)(4) (D) was intended to prohibit," 486 F. 2d, at 866, but refused to enforce the Board's order because it decided that the Board had not complied with the Act, 5 U. S. C. § 554.[12] The court was under the impression that the

---

[10] Exception 16 brought to the Board's attention the failure of the trial examiner to address respondent's argument that the Act had been violated by the participation of attorney Schulson in both the § 10 (k) and § 8 (b)(4)(D) proceedings. Since the issue of the applicability of the Act was presented to the Board, the Court of Appeals was entitled to consider the objection, and so are we. 29 U. S. C. §§ 160 (e)–(f).

[11] *Ibid.*

[12] Title 5 U. S. C. § 554 provides:

"(a) This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

"(1) a matter subject to a subsequent trial of the law and the facts de novo in a court;

"(2) the selection or tenure of an employee, except a hearing examiner appointed under section 3105 of this title;

"(3) proceedings in which decisions rest solely on inspections, tests, or elections;

"(4) the conduct of military or foreign affairs functions;

"(5) cases in which an agency is acting as an agent for a court; or

parties had "admitted that § 554 applies to § 10 (k) hearings," 486 F. 2d, at 867, and regarded the participation by Schulson in both proceedings as a violation of 5 U. S. C.

"(6) the certification of worker representatives.

"(b) Persons entitled to notice of an agency hearing shall be timely informed of—

"(1) the time, place, and nature of the hearings;

"(2) the legal authority and jurisdiction under which the hearing is to be held; and

"(3) the matters of fact and law asserted.

"When private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the time and place for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

"(c) The agency shall give all interested parties opportunity for—

"(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

"(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

"(d) The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not—

"(1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

"(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

"An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this

§ 554 (d), which prohibits commingling prosecutorial and adjudicatory functions. See n. 12, *supra*. Even though the Board had argued that the § 10 (k) proceeding "was without binding effect on anyone" so that "it was not improper for the same person to perform the functions of hearing officer and subsequently prosecute an unfair labor practice charge based upon the evidence adduced at that hearing," the Court of Appeals relied upon this Court's opinion in *NLRB* v. *Plasterers' Union,* 404 U. S. 116 (1971), to support its conclusion that "the hearing officer's rulings at the § 10 (k) hearing largely determine what evidence the Board will have to consider at the Unfair Labor Practice Hearing . . . ." 486 F. 2d, at 866–867. With that perspective, the Court of Appeals found the attorney's participation to be "plainly inconsistent with both the spirit and the letter of the Act." *Id.,* at 868.

## I

To determine whether § 554 governs proceedings conducted under § 10 (k) of the National Labor Relations Act necessitates some understanding of both statutory provisions which, as noted above, were enacted within a year of each other. The Administrative Procedure Act was aptly described in *Wong Yang Sung, supra,* as "a new, basic and comprehensive regulation of procedures in many agencies," 339 U. S., at 36. The Court there

title, except as witness or counsel in public proceedings. This subsection does not apply—

"(A) in determining applications for initial licenses;

"(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

"(C) to the agency or a member or members of the body comprising the agency.

"(e) The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty."

further observed that the Act "contains many compromises and generalities and, no doubt, some ambiguities." *Id.,* at 40–41. Because it was designed to regulate administrative proceedings throughout a wide spectrum of agency activities, its language is necessarily abstract in many places. The more we may know about the particular agency proceeding to which the Act is sought to be applied, the better we will be able to apply it.

The events leading up to the enactment of §§ 8 (b)(4)(D) and 10 (k) have been recounted by this Court in *CBS, supra,* and *Plasterers' Union, supra,* and need not here be reviewed in detail. Congress made the judgment "that it is more important to industrial peace that jurisdictional disputes be settled permanently than it is that unfair labor practice sanctions for jurisdictional strikes be imposed upon unions." *CBS,* 364 U. S., at 577. Voluntary and therefore prompt resolution of such jurisdictional disputes is encouraged both by the 10-day grace period following notice of the filing of an unfair labor practice charge, and by the dismissal of such a charge if the union complies with the Board's adverse § 10 (k) determination. 29 CFR § 101.36.

To effectuate the congressional objective of prompt resolution of jurisdictional disputes, almost from the date of the enactment of § 10 (k), the Board has applied procedures to proceedings under that section that are quite different from those of a proceeding under § 8 (b)(4)(D). The § 10 (k) hearing is described in the Board's regulations:

> "If the parties have not adjusted the dispute or agreed upon methods of voluntary adjustment, a hearing, usually open to the public, is held before a hearing officer. The hearing is nonadversary in character, and the primary interest of the hearing officer is to insure that the record contains as full a

statement of the pertinent facts as may be necessary for a determination of the issues by the Board. All parties are afforded full opportunity to present their respective positions and to produce evidence in support of their contentions. The parties are permitted to argue orally on the record before the hearing officer. At the close of the hearing, the case is transmitted to the Board for decision. The hearing officer prepares an analysis of the issues and the evidence, but makes no recommendations in regard to resolution of the dispute." 29 CFR § 101.34.

Streamlined procedures were both designed and justified because "the decision in the proceedings under Section 10 (k) is a preliminary administrative determination made for the purpose of attempting to resolve a dispute within the meaning of that section; the unfair labor practice itself is litigated at a subsequent hearing before a Trial Examiner in the event the dispute remains unresolved." *National Union of Marine Cooks & Stewards (Irwin-Lyons Lumber Co.)*, 83 N. L. R. B. 341 (1949).[13]

---

[13] The Board has adhered consistently to this position. See, *e. g.*, *International Longshoremen's & Warehousemen's Union (General Ore, Inc.)*, 124 N. L. R. B. 626, 628–629 (1959):

"It is well established that Section 8 of the Administrative Procedure Act, which provides for the issuance of the initial decision by the hearing officer, does not apply to a proceeding under Section 10 (k). Under Section 101.30 of the Statements of Procedure and Section 102.80 of the Board's Rules and Regulations, Series 7, the hearing under Section 10 (k) is nonadversary in character and, according to the procedure adopted therefor, conducted in the same way as a hearing in a representation proceeding. The Board adopted such procedure because the decision under Section 10 (k) is a preliminary administrative determination made for the purpose of attempting to resolve a dispute within the meaning of that section. The unfair labor practice itself is litigated at a subsequent hearing before a Trial Examiner if the dispute remains unresolved. It is to

The Board concluded from this analysis of the nature of the § 10 (k) proceeding that the provisions of the Act governing adjudications were not applicable. While an agency's interpretation of the Act may not be entitled to the same weight as the agency's interpretation of its own substantive mandate, see *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224, 236 n. 6 (1973), its characterization of its own proceeding is entitled to weight, and that characterization may in turn have relevance in determining the applicability of the Act.

## II

The question which we must decide here is whether the § 10 (k) determination is an "adjudication" governed by the Act, 5 U. S. C. § 554. The Court of Appeals did not consider in any detail whether § 554 governs § 10 (k) proceedings since it was under the impression that the parties had conceded the general applicability of this

the subsequent adversary proceeding, which leads to a final Board determination, that Section 8 of the Administrative Procedure Act applies. The primary function of the hearing officer, who is acting under the delegation of authority from the Board, in a nonadversary proceeding is to insure that the record contains a full statement of pertinent facts as may be necessary for the determination of the dispute by the Board. The hearing officer makes no recommendations in regard to the resolution of the dispute. While we think it better practice not to assign a Board agent who has previously engaged in the performance of investigative and prosecuting functions for the Agency to act as a hearing officer in the same or in a related case, we find that the Longshoremen in the instant case was not prejudiced by such assignment. The Longshoremen does not allege that it was denied the opportunity to present evidence in support of its contentions, or that it was prejudiced in any other manner by the conduct of the hearing officer." (Footnotes omitted.)

In *General Ore*, unlike the present case, the hearing officer had previously represented the General Counsel in proceedings factually related to the § 10 (k) proceeding at which he *later* presided.

section to such hearings. 486 F. 2d, at 867. Petitioner and the Board contend that the Court of Appeals was mistaken with respect to any such concession, and state that they argued both in their principal briefs and in their petitions for rehearing that § 554 was not applicable. Respondent acknowledges that no such concession was made,[14] and we therefore address the issue on its merits.

If one were to start with the proposition that all administrative action falls into one of two categories, rulemaking or adjudication, the § 10 (k) determination certainly is closer to the latter than to the former. But such light as we have on the intention of Congress when it enacted the Act does not indicate that this is a sound starting point. Knowledgeable authorities in this field observed shortly after passage of the Act that "certain types of agency action are neither rule making nor adjudication." Ginnane, "Rule Making," "Adjudication" and Exemptions Under the Administrative Procedure Act, 95 U. Pa. L. Rev. 621, 633 (1947); Netterville, The Administrative Procedure Act: A Study in Interpretation, 20 Geo. Wash. L. Rev. 1, 33 (1951); cf. Attorney General's Manual on the Administrative Procedure Act 40 (1947).

Section 554 applies "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing,"[15] and 5

---

[14] Tr. of Oral Arg. 20.

[15] The Board, which did not join with petitioner in seeking review of this case but which is nevertheless a party to the case under this Court's Rule 21 (4), urges that even if the § 10 (k) proceeding is an "adjudication" under the Act, the language in § 10 (k) directing the Board "to hear and determine the dispute" is not sufficient to bring the proceeding within the language of 5 U. S. C. § 554, which operates in the case of adjudications "required by statute to be determined on the record after opportunity for an agency hearing." In light

U. S. C. § 551 (7), defines "adjudication" as "agency process for the formulation of an order"; "order" is in turn defined as "the whole or a part of a final disposition . . . of an agency in a matter other than rule making but including licensing," 5 U. S. C. § 551 (6). While one might argue that an intermediate proceeding within an agency is necessarily a "part" of a "final order," we think a sounder interpretation of the language Congress used is that the phrase "whole or a part" refers to components of that which is itself the final disposition required by the definition of "order" in § 551 (6). Intermediate proceedings within an agency may be subject to the provisions of § 554, however, by virtue of the fact that they are "agency process for the formulation of an order" rather than because their product is a "part" of the final disposition. Thus if the Board's § 10 (k) determination is itself a "final disposition" of a Board proceeding or is "agency process for the formulation" of an order in a resulting § 8(b)(4)(D) proceeding, then the § 10 (k) proceeding is governed by 5 U. S. C. § 554.

In a tautological sense, of course, the Board's determination in a § 10 (k) proceeding is a "final disposition" of *that* proceeding, but we think that when Congress defined "order" in terms of a "final disposition," it required that "final disposition" to have some determinate consequences for the party to the proceeding. The Board does not order anybody to do anything at the conclusion of a § 10 (k) proceeding. As the Attorney General's Manual on the Administrative Procedure Act 40 (1947) observed: "[I]nvestigatory proceedings, no matter how formal, which do not lead to the issuance of an order containing the element of final disposition as required by the definition, do not constitute adjudication." This

---

of our disposition of the case it is unnecessary to address this contention.

Court noted in *Plasterers' Union,* 404 U. S., at 126, that "the § 10 (k) decision standing alone, binds no one." We conclude, therefore, that the § 10 (k) determination is not itself a "final disposition" within the meaning of "order" and "adjudication" in 5 U. S. C. §§ 551 (6), (7).

Respondent's principal argument for affirmance of this case rests on the contention that although the § 10 (k) determination may not itself be a "final disposition," and therefore an "order," it is "agency process for the formulation" of the ultimate § 8 (b)(4)(D) order that the Board may issue.

There are undoubtedly important practical consequences in the § 8 (b)(4)(D) proceeding that result from the Board's determination in the § 10 (k) proceeding. These were described in the following language in *Plasterers' Union, supra,* at 126–127:

> "[T]he impact of the § 10 (k) decision is felt in the § 8 (b)(4)(D) hearing because for all practical purposes the Board's award determines who will prevail in the unfair labor practice proceeding. If the picketing union persists in its conduct despite a § 10 (k) decision against it, a § 8 (b)(4)(D) complaint issues and the union will likely be found guilty of an unfair labor practice and be ordered to cease and desist. On the other hand, if that union wins the § 10 (k) decision and the employer does not comply, the employer's § 8 (b)(4)(D) case evaporates and the charges he filed against the picketing union will be dismissed. Neither the employer nor the employees to whom he has assigned the work are legally bound to observe the § 10 (k) decision, but both will lose their § 8 (b)(4)(D) protection against the picketing which may, as it did here, shut down the job. The employer will be under intense pressure, practically, to conform to the Board's decision. This is the design of the Act; Congress provided no other

way to implement the Board's § 10 (k) decision."
(Footnote omitted.)

But we do not think that such practical consequences alone make the § 10 (k) proceeding related to the § 8 (b)(4)(D) proceeding in a manner that would make the former "agency process" for the formulation of the order in the latter. The prototype of an intermediate proceeding that is "agency process for the formulation of an order," is a hearing before an administrative law judge who makes findings of fact and conclusions of law, initially decides the case, and whose recommended decision "becomes the decision of the agency . . . unless there is an appeal to, or review on motion of, the agency." 5 U. S. C. § 557 (b). All of the parties to this case, for instance, agree that the § 8 (b)(4)(D) unfair labor practice hearing before the trial examiner (now administrative law judge) was subject to § 554 since it was "agency process for the formulation of an order."

The relationship between the § 10 (k) proceeding and the § 8 (b)(4)(D) proceeding, however, is quite distinct from the relationship between the hearing before an administrative law judge and ultimate review of his findings and recommendations by the agency. The § 10 (k) proceeding has a life of its own from the time that testimony is taken in the field by a hearing officer until the time the Board, with the record of the testimony before it but with no proposed findings or conclusions or recommendations from the hearing officer, reaches its own determination. The Board's attention in the § 10 (k) proceeding is not directed to ascertaining whether there is substantial evidence to show that a union has engaged in forbidden conduct with a forbidden objective. Those inquiries are left for the § 8 (b)(4)(D) proceeding.[16]

--------

[16] The Board's powers under § 10 (k) depend upon whether there is reasonable cause to believe that § 8 (b)(4)(D) has been violated. In the present case the Board reviewed the record compiled by

Indeed, the Board's § 10 (k) determination is not unlike an advisory opinion, since the matter may well end there. If the Board determines that employees of the charged union are entitled to the work, the § 8 (b)(4)(D) charge against it will be dismissed. 29 CFR § 102.91. If the Board determination is adverse to the charged union and the union accedes, the § 8 (b)(4)(D) charge will be dismissed and the General Counsel will not issue a complaint. *Ibid.* Only if the union indicates that it will not comply with the Board's determination are further proceedings necessitated, and those proceedings will be under § 8 (b)(4)(D), not § 10 (k). As this Court observed in *Plasterers' Union,* 404 U. S., at 122 n. 10:

> "The § 10 (k) determination is not binding as such even on the striking union. If that union continues to picket despite an adverse § 10 (k) decision, the Board must prove the union guilty of a § 8 (b)(4) (D) violation before a cease-and-desist order can issue. The findings and conclusions in a § 10 (k) proceeding are not *res judicata* on the unfair labor practice issue in the later § 8 (b)(4)(D) determination. *International Typographical Union,* 125 N. L. R. B. 759, 761 (1959). Both parties may put

the hearing officer and concluded that the requisite reasonable cause existed. The respondent suggested that certain testimonial evidence was incredible, but the Board observed:

"In a jurisdictional dispute context, the Board is not charged with finding that a violation did in fact occur, but only that there is reasonable cause to believe that there has been a violation. On this testimony, and without ruling on the credibility of the testimony in issue, we are satisfied that there is reasonable cause to believe that a violation of Section 8 (b)(4)(D) has occurred." 191 N. L. R. B., at 830 (footnotes omitted).

By contrast, a union can be found guilty of committing an unfair labor practice only if a violation is established by a preponderance of the evidence. 29 U. S. C. § 160 (c).

in new evidence at the § 8 (b)(4)(D) stage, although often, as in the present cases, the parties agree to stipulate the record of the § 10 (k) hearing as a basis for the Board's determination of the unfair labor practice. Finally, to exercise its powers under § 10 (k), the Board need only find that there is reasonable cause to believe that a § 8 (b)(4)(D) violation has occurred, while in the § 8 (b)(4)(D) proceeding itself the Board must find by a preponderance of the evidence that the picketing union has violated § 8 (b)(4)(D). *International Typographical Union, supra,* at 761 n. 5 (1959)."

In each case it is the agency itself, the National Labor Relations Board, which makes the ultimate determination. The same issues will generally be relevant, the record of the earlier proceeding will be admitted in the later one, 29 CFR § 102.92, and the Board's ruling on the merits of those issues which are common to the two proceedings is likely to be the same in the one as in the other. But the proceedings are nonetheless separate; the same tribunal finally determines each of them.

Were we to adopt respondent's position that merely because a § 10 (k) determination has a significant practical effect on the § 8 (b)(4)(D) proceeding, it was therefore "agency process for the formulation" of the § 8 (b)(4)(D) order, we might well sweep under the definition of that term numerous ancillary agency proceedings that are distinct from the adjudications on which they have an effect, and which the language of the Act does not appear to have been designed to reach. We therefore decline to adopt that position. We accordingly conclude that a § 10 (k) determination is neither itself a final disposition under the definitional section of the Act, nor is it "agency process for the formulation of an order" within the meaning of that section. Proceedings under

§ 10 (k) are therefore not governed by the Act, 5 U. S. C. § 554.

Although the Board's § 10 (k) proceedings need not be conducted pursuant to the Act, 5 U. S. C. § 554, the agency remains "free under the Act to accord litigants appearing before it more procedural rights than the Act requires," *Florida East Coast R. Co.*, 410 U. S., at 236 n. 6.[17] The Board's procedures are, of course, constrained by the Due Process Clause of the Fifth Amendment, but respondent has raised no contention that attorney Schulson's participation in both proceedings approached a constitutional violation.[18]

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[17] The Board indicates that "[i]t is not general practice to use the same person who hears the Section 10 (k) case to investigate and prosecute the subsequent Section 8 (b)(4)(D) case." Memorandum for the NLRB 4 n. 4.

[18] There is a suggestion in the opinion of the Court of Appeals that the Board's order should not be enforced even if the Act does not govern the § 10 (k) proceeding because the commingling of functions was "incompatible with the accepted norms for the proper administration of justice." 486 F. 2d 863, 868. Cf. *Wong Yang Sung* v. *McGrath*, 339 U. S. 33 (1950). In the present case, however, attorney Schulson prosecuted the case for the General Counsel *after* he had presided at the § 10 (k) proceeding. Even if it be assumed that his function at the § 10 (k) proceeding was judicial in nature, it is hard to see how this sequence of events would present the danger of commingling which the Court of Appeals saw. The Court of Appeals may have confused "hearing officers" with "trial examiners" or "hearing examiners" (now "administrative law judges") who are ordinarily required to make recommended decisions, 5 U. S. C. § 557 (b), and who must be appointed pursuant to 5 U. S. C. § 3105. 486 F. 2d, at 867 n. 3.