CENTRAL SCOTT TELEPHONE
COMPANY, Plaintiff,

v.

TELECONNECT LONG DISTANCE
SERVICES and SYSTEMS
COMPANY, Defendant.

Civ. No. 3–92–CV–10129.

United States District Court,
S.D. Iowa,
Davenport Division.

Aug. 27, 1993.

Mark J. Botti, James U. Troup, Washington, DC, Michael P. Joynt, James G. Sawtelle, Sullivan & Ward, Des Moines, IA, for plaintiff.

Philip E. Stoffregen, Richard A. Malm, Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, IA, for defendant.

ORDER

LONGSTAFF, District Judge.

THE COURT HAS BEFORE IT Defendant Teleconnect Long Distance Services and Systems Company's ("Teleconnect") motion for summary judgment, submitted March 29, 1993. Plaintiff Central Scott Telephone Company ("Central Scott") resisted the motion on April 15, 1993. Defendant filed a reply on May 7, 1993.[1] A hearing was held before the Court on July 14, 1993.

I. BACKGROUND

Plaintiff Central Scott Telephone Company ("Central Scott") is a local telephone exchange company (LEC) serving individuals and businesses located in Donahue, Eldridge and McCausland, Iowa. Defendant Teleconnect Long Distance Services and Systems

---

1. Central Scott also submitted a supplemental brief on June 2, 1993, to which Teleconnect replied on June 18, 1993.

Company ("Teleconnect") is a long distance, or "interchange" carrier.

Lacking its own local exchange facilities, Teleconnect purchases exchange services from Central Scott to gain access to long distance customers in Central Scott's service area. The terms, conditions, and rates under which Central Scott provides access service are specified in tariffs drafted by independent trade associations and filed with the Iowa State Utilities Board and the Federal Communications Commission.[2] It is important to note the relevant language in the intrastate tariff at issue is identical to that contained in the interstate tariffs.

This action stems from a bill Central Scott issued on December 26, 1989, for access services provided to Teleconnect between January 1, 1987, and March 31, 1989. Teleconnect disputed the accuracy of the charges in the bill and refused to pay it in full.

Central Scott's charges were for "Feature Group A" ("FGA") access service provided to Teleconnect. Under this system, customers were forced to dial a seven-digit access code to be connected with the long distance carrier of their choice. Charges for access were computed on the basis of customer minutes of use; the present dispute centers on determining such minutes.[3]

The total FGA access minutes of use provided to Teleconnect by all local exchange companies within the Davenport area were recorded at the Davenport central office of U.S. West. The actual minutes provided by each individual local exchange company such as Central Scott could not be directly measured. Therefore, total FGA access minutes

of use measured at the Davenport central office were proportionally allocated to each local exchange company.

Central Scott computed the December 26, 1989 bill by applying a mechanism referred to as an "FGD offset credit." Central Scott claims the FGD offset credit was implicit in the "Transition Billing Arrangement" provisions described in its tariffs. Teleconnect disagrees, arguing that the offset credit was not implied in the tariff language.

## UTILITY BOARD PROCEEDINGS

After learning Teleconnect did not intend to pay the December 26, 1989, bill in full, Central Scott sent Teleconnect a notice containing a late payment charge, forwarding a copy of the letter to the Iowa State Utilities Board ("ISUB"). The ISUB treated this communication as an informal complaint, and on January 29, 1991, issued a proposed resolution letter calling for Teleconnect to pay Central Scott.

Teleconnect filed a request for formal complaint proceedings on February 15, 1991, which was found to be untimely by the ISUB. Nevertheless, on March 18, 1991, the ISUB docketed the matter as a formal complaint proceeding on its own motion, pursuant to Iowa Code § 476.3(1).[4]

The specific issue identified for review was whether Teleconnect was billed by Central Scott in accordance with the *intrastate* tariff on file. The Utility Board did not attempt to discuss the interstate tariffs—even though the tariffs contained identical language. The Utility Board also noted the proceeding "is

---

**2.** Central Scott did not draft the tariffs used to bill for both intrastate and interstate access services. Rather, it uses all or portions of tariffs drafted by independent trade associations, and filed with the respective "regulatory" agency. Specifically, Central Scott billed Teleconnect for interstate services based on tariffs No. 1 and No. 5, drafted by the National Exchange Carriers Association ("NECA"), and on file with the Federal Communications Commission ("FCC"). Intrastate access services were billed according to Iowa Telephone Association Tariff No. 1, which is on file with the Iowa State Utilities Board ("ISUB").

**3.** During this billing period, local exchange companies in the Davenport area were in a transition process of making "Equal Access" available. Under Equal Access, which is also called "Feature Group D" access, long distance customers may make a choice of any long distance carrier as their primary carrier. They can then make long distance calls through that primary carrier by dialing "1" plus the number. In equal access end offices, FGD access minutes of use can be recorded for each long distance carrier. Central Scott had not made the transition to Equal Access during the times at issue.

**4.** Defendant had previously filed an untimely request for formal complaint proceedings.

not the proper forum to compel Teleconnect to pay Central Scott."

The case was assigned to an administrative law judge ("ALJ"), and an evidentiary hearing was held on September 16, 1991. On February 10, 1992, the ALJ issued a "Proposed Decision and Order." The ALJ found that the FGD offset credit was not implicit in Central Scott's intrastate tariff during the billing period, and should not have been used. The ALJ concluded Central Scott should have followed either the Transition Billing Arrangement without employing an FGD offset credit or the "PEC/SEC" provisions, whichever resulted in the lower charge.[5]

Although the administrative law judge stated that the issue was not to conceive a tariff that would "yield results more fairly", he noted that neither method "resulted in a fair estimation" of Teleconnect's FGA minutes of use for Central Scott's services. He stated that "one could fairly compute" Teleconnect's FGA minutes of use by applying the Transition Billing Arrangement plus adding new language providing for the FGD offset credit. FGD offset credit provisions were added to the NECA tariffs and became effective on August 4, 1989—five months after the billing period at issue here.

The ALJ's Proposed Decision and Order was affirmed with a slight modification by the Utility Board on June 4, 1992. The Utilities Board concluded that the Transition Billing Arrangement without any implicit application of the FGD offset credit was the proper method for the disputed billing period. Central Scott did not seek judicial review of the decision.

During the Utility Board's proceedings the parties entered into a tolling agreement which provided:

> If Central Scott brings an action against Teleconnect in connection with interstate and/or intrastate Feature Group A access services provided by Central Scott to Tele-connect between December 19, 1987 and March 31, 1989, such action shall be deemed to have been filed, for purposes of any statute of limitations that may apply to the action, as of December 11, 1991, provided such action is filed on or before the ninetieth day following a final order of the Iowa Utilities Board terminating the proceeding styled In re Telecom*USA, Docket No. FCU–91.

### PRESENT ACTION

On August 24, 1992, Central Scott filed the present action in this Court for payment of the December 26, 1989, bill. Central Scott claims Teleconnect is required by federal law to pay Central Scott $345,034.26 for interstate access service. Central Scott further claims Teleconnect is required by Iowa law to pay Central Scott $148,250.57 for intrastate access service.[6] On June 28, 1993, the parties stipulated that these figures are correct *if* the FGD offset credit formula is applied for the services at issue.

On March 29, 1993, Teleconnect filed a motion for summary judgment. Teleconnect argues the claim under the federal tariffs is barred by the two-year statute of limitations set forth in Section 415 of the Communications Act of 1934, and that the state claim is partially barred by a five-year Iowa statute of limitations set forth in Section 614.1(4) of the Iowa Code. Teleconnect also contends that Central Scott's entire claim is foreclosed by the ISUB decision under the doctrine of issue preclusion.

In response, Central Scott argues it filed its complaint within the applicable limitations periods, and that the statutory provision upon which Teleconnect stakes its federal statute of limitations theory does not apply. Central Scott further contends the statements of the Utilities Board do not give rise to collateral estoppel and that federal law

---

5. The telephone company that owns the dial tone office is referred to as the Primary Exchange Carrier ("PEC"), with the local telephone company referred to as a Secondary Exchange Carrier ("SEC").

6. These are the amounts as listed in Plaintiff's amended complaint, filed April 2, 1993. The intrastate portion reflects a payment of $21,-476.63 made previously by Teleconnect. The interstate portion also reflects a previous payment of $33,681.02.

and policy prohibit giving collateral estoppel effect to the Utilities Board decision.

## II. APPLICABLE LAW AND DISCUSSION

### A. Summary Judgment

Summary judgment is properly granted when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). In deciding whether to grant a motion for summary judgment, the district court must view the evidence in favor of the party opposing the motion and give that party the benefit of all reasonable inferences. *Kegel v. Runnels,* 793 F.2d 924, 926 (8th Cir.1986).

Nevertheless, the resisting party must set forth specific facts showing there is a genuine issue for trial and may not rely solely on legal conclusions to prove there is a genuine issue of material fact justifying denial of summary judgment. Fed.R.Civ.P. 56(e).

### B. Statute of Limitations

#### 1. Federal Statute of Limitations

■ Teleconnect first argues Central Scott's claim made under the federal tariffs is barred by the two-year statute of limitations set forth in Section 415 of the Communications Act of 1934, 47 U.S.C. § 415. The relevant portion of 47 U.S.C. § 415 provides:

> **(a) Recovery of charges by carrier**
>
> All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun, within two years from the time the cause of action accrues, and not after.
>
> . . . .
>
> **(e) Accrual of cause of action for transmission of message**
>
> The cause of action in respect of the transmission of a message shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after.

47 U.S.C.A. § 415 (West 1991).

In its motion for summary judgment, Teleconnect argues the cause of action accrued at the time the access services were rendered, and that the last services for which payment is now sought were completed on March 31, 1989. Therefore, Central Scott's claim based on the federal tariffs is barred under section 415(a) and (e) above.

In turn, Central Scott contends its claim did not arise until it learned Teleconnect had no intention of paying Central Scott's bills. According to Central Scott, this date is in full accord with FCC interpretations of the limitations period as beginning to run when "discovery of the right or wrong or of the facts on which such knowledge is chargeable in law." *AT & T v. Northwestern Bell Tel. Co.,* 5 FCC Rcd. 143, 148 ¶ 51 (1990) (*citing Bunker Ramo Corp.,* 31 FCC 2d 449, 454 (1971)).[7]

The Court finds the FCC's interpretation persuasive, and refuses to get bogged down in a discussion of whether Teleconnect caused the delay in billing by breaching its obligation to provide usage information to Central Scott. The simple fact is that Central Scott billed as soon as practicable, and had no earlier indication that Teleconnect would question the billing method. In *AT & T,* the FCC stated: "[t]he purpose of Section 415 is to protect a potential defendant against stale and vexatious claims by ending the possibility of litigation after a reasonable period of time has elapsed." *AT & T v. Northwestern Bell Tel. Co.,* 5 FCC Rcd. at ¶ 52. This is not a situation in which Central Scott slept on its rights, or attempted to resurrect a "stale and vexatious claim." Central Scott filed the present action less than three months after the ISUB issued its decision.

Furthermore, the FCC has recently stated that section 415(e) "concerns a carrier's liability to its customers for failure to transmit a message in accordance with its common

---

7. In *Tele–Valuation, Inc. v. AT & T, Co.,* 73 FCC 2d 450 (1979), the FCC interpreted § 415(c) and found a tariff overcharge claim accrued upon receipt of the bill. Even under this interpretation, the tolling agreement ensures Central Scott filed within the two-year limitations period commencing at the issuance of the December 26, 1989, bills.

carrier obligations." *Williams Telecommunications Group, Inc. v. The Chesapeake & Potomac Tel. Cos.*, 8 FCC Rcd. 1161 ¶ 16 n. 35 (1993). This case does not involve the transmittal of messages, but rather, the provision of access services to enable Teleconnect to then transmit messages.

The Court finds the statute of limitations for the federal claim began to run on January 26, 1990, the due date of the December 26, 1989 bills. Pursuant to the tolling agreement signed by both parties, this case was deemed filed as of December 11, 1991—well within the two year limitations period set forth in 47 U.S.C. § 415(a).

### 2. Iowa Statute of Limitations

Teleconnect also alleges Central Scott's state claim is partially barred by a five-year Iowa statute of limitations set forth in Section 614.1(4) of the Iowa Code, arguing that the tolling agreement does not apply to the state law claim. Teleconnect concedes Iowa has no special limitations period for tariff claims.

The Iowa Supreme Court has repeatedly recognized the discovery rule in actions ranging from a claim for an alleged violation of Iowa's bulk transfer law to an action against an architect for negligent design. *See e.g. Nachazel v. Mira Co. Mfg.*, 466 N.W.2d 248, 252 (Iowa 1991) (bulk transfer violation); *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985) (products liability); *Brown v. Ellison*, 304 N.W.2d 197, 200 (Iowa 1981) (action on oral contract containing express and implied warranties); *Orr v. Lewis Central School Dist.*, 298 N.W.2d 256, 262 (Iowa 1980); *Chrischilles v. Griswold*, 260 Iowa 453, 462, 150 N.W.2d 94, 100 (1967) (negligent architectural design); *see also Dirksen v. Hynes & Howes Ins. Counselors, Inc.*, 423 F.Supp. 1290, 1294–95 (S.D.Iowa 1976) (claim of fraud under Iowa Uniform Securities Act). This Court sees no reason not to invoke the discovery rule in the present case.

Moreover, this Court finds the tolling agreement signed by the parties applies equally to Central Scott's intrastate claim. Specifically, the agreement applies "[i]f Central Scott brings an action against Teleconnect *in connection with interstate and/or intrastate Feature Group A access services* provided by Central Scott to Teleconnect between December 19, 1987 and March 31, 1989...." December 11, 1991, Tolling Agreement (emphasis added). There is no statute of limitations problem with respect to the intrastate claim.[8]

### C. Issue Preclusion

■ Federal courts generally will not hesitate to apply issue or claim preclusion to final decisions made by state administrative agencies, provided the agencies acted in a judicial capacity when they rendered the decisions, and the parties were given full opportunity to litigate the issues. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796–99, 106 S.Ct. 3220, 3225–26, 92 L.Ed.2d 635 (1986); *Astoria Fed. Savs. & Loan Ass'n v. Solimino*, — U.S. —, —, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991). In the present case, it is clear both parties were afforded full due process rights in presenting their arguments in an evidentiary hearing held before the ALJ. Both parties conducted ample pre-hearing discovery, presented witnesses for direct testimony, and cross-examined opposing witnesses. Likewise, the ISUB decision has many of the characteristics of an "adjudication." The ISUB first isolated the specific issue to be determined: whether Central Scott had billed Teleconnect in accordance with the intrastate tariff on file. *See Restatement (Second) of Judgments* § 83 (1982). The ALJ and ISUB also focused on the specific parties and tariff at issue, rather than espousing general policy on utility tariffs. *See e.g. Portland Audubon Soc'y. v. Endangered Species Comm.*, 984 F.2d 1534, 1540 (9th Cir.1993) (citing *Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1262 (9th Cir.1977) (distinguishing adjudication from rule-making).[9]

---

8. Central Scott argues alternatively that a ten-year statute of limitations should apply, based on the fact Teleconnect views the tariff as a contract. The Court need not address this argument.

9. In arguing that the ISUB decision should not be considered an adjudication, Central Scott claims the agency was acting in a "rate-making" capacity. However, the Court finds the Board was simply *interpreting* an existing tariff. In his Proposed Decision and Order, the ALJ stated,

One crucial distinction, however, prevents the present case from fitting neatly into either the *Solimino* or *Elliott* mold: The order issued by the ISUB has no binding effect on either party.

■ Section 551 of the Administrative Procedure Act ("APA") defines "adjudication" as an "agency process for the formulation of an order." 5 U.S.C.A. § 551(7) (West 1977). "Order" is defined as "the whole or a part of a *final disposition* ... in a matter other than rule making...." *Id.* § 551(6) (emphasis added). In *IT & T, Corp. v. Local 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 443, 95 S.Ct. 600, 610, 42 L.Ed.2d 558 (1975), the Supreme Court held:

> we think that when Congress defined "order" in terms of a "final disposition," it required that "final disposition" to have some determinative consequences for the party to the proceeding. The Board does not order anybody to do anything at the conclusion of [the proceeding at issue]. As

the Attorney General's Manual on the Administrative Procedures Act 40 (1947) observed: "[I]nvestigatory proceedings, no matter how formal, which do not lead to the issuance of an order containing the element of final disposition as required by the definition, *do not constitute adjudication.*

*Id.* (emphasis added).

Granted, collateral estoppel was not at issue in *IT & T.*[10] However, the Court's definition of "final disposition" is instructive. This definition is also consistent with the *Restatement (Second) of Judgments*, which requires "[s]uch other procedural elements as may be necessary to constitute the proceeding a sufficient means of *conclusively determining the matter in question.*" *Restatement (Second) of Judgments* § 83(2)(d) (emphasis added).[11]

The fact the ALJ's decision was affirmed by the ISUB on appeal does not in and of

---

"[t]he issue in this case is not whether a tariff conceived and framed differently would yield results more consonant with fairness"—making it obvious the ISUB neither intended to evaluate the reasonableness of the tariffs, nor alter them in any way.

10. The Court discussed the definitions of "adjudication" and "final disposition" for the sole purpose of determining whether the National Labor Relations Board (NLRB) acted contrary to the APA by allowing an NLRB attorney to act both as hearing officer in the initial, investigative hearing and as prosecutor on the formal unfair labor practice charge.

11. Section 83 of the *Restatement (Second) of Judgments* provides:

Adjudicative Determination by Administrative Tribunal

(1) Except as stated in Subsections (2), (3), and (4), a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court.

(2) An adjudicative determination by an administrative tribunal is conclusive under the rules of res judicata only insofar as the proceeding resulting in the determination entailed the essential elements of adjudication, including:

  (a) Adequate notice to persons who are to be bound by the adjudication, as stated in § 2;

  (b) The right on behalf of a party to present evidence and legal argument in support of the party's contentions and fair opportunity to re-

but evidence and argument by opposing parties;

  (c) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof;

  (d) A rule of finality, specifying a point in the proceedings when presentations are terminated and a final decision is rendered; and

  (e) Such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions.

(3) An adjudicative determination of a claim by an administrative tribunal does not preclude relitigation in another tribunal of the same or a related claim based on the same transaction if the scheme of remedies permits assertion of the second claim notwithstanding the adjudication of the first claim.

(4) An adjudicative determination of an issue by an administrative tribunal does not preclude relitigation of that issue in another tribunal if according preclusive effect to determination of the issue would be incompatible with a legislative policy that:

  (a) The determination of the tribunal adjudicating the issue is not to be accorded conclusive effect in subsequent proceedings; or

  (b) The tribunal in which the issue subsequently arises be free to make an independent determination of the issue in question.

itself create a "final disposition" for purposes of issue preclusion. The ISUB could not compel payment in the event it interpreted the intrastate tariff in Central Scott's favor. Nor would it redraft the tariff in a manner it felt was more reasonable. *See In re Telecom\*USA,* Proposed Decision and Order, Iowa Dep't. of Commerce, Utilities Div., No. FCU–91–2, at 19, 1992 WL 314671 (Feb. 10, 1992). Rather, the ISUB decision has no more effect than an advisory opinion, implicitly *requesting* Central Scott to change its billing, but lacking binding authority. This Court cannot characterize this type of decision as one deserving of issue preclusion.

The New York Court of Appeals faced a similar situation in *Staatsburg Water Co. v. Staatsburg Fire Dist.,* 72 N.Y.2d 147, 531 N.Y.S.2d 876, 527 N.E.2d 754 (1988). *Staatsburg* was a suit filed by a public water utility against the village fire department, a customer of the water company. The fire department had previously refused to pay the plaintiff for water service, claiming the service was inadequate. The plaintiff utility filed a motion for summary judgment, seeking to have preclusive effect given to a decision made by the Public Service Commission (PSC) that the water service provided was adequate. *Id.* at 151, 531 N.Y.S.2d 876, 527 N.E.2d 754.

The supreme court denied the plaintiff's motion, finding that the PSC had not reached the actual merits of the plaintiff's claim. The appellate division reversed the supreme court's decision and granted summary judgment for the plaintiff. The appellate division found that the "PSC was an appropriate body to determine the adequacy of the plaintiff's services, the hearing procedures were substantially similar to those utilized in a court of law, and the defendant was given an opportunity to present and cross-examine witnesses, present exhibits and submit briefs." *Id.* at 152, 531 N.Y.S.2d 876, 527 N.E.2d 754.

The New York Court of Appeals then reversed the appellate division's decision, reasoning, "[c]ollateral estoppel is an elastic doctrine and the enumeration of [its] elements is

intended as a framework, rather than a substitute, for analysis." *Id.* at 153, 531 N.Y.S.2d 876, 527 N.E.2d 754. As in the present case, the PSC initiated the hearing on its own motion, and as such, "the defendant was not, in the true sense of the word, a party to the PSC proceeding." *Id.* Also similar to the present case, the PSC "had no power to compel defendant to pay for the water service." *Id.*

> In these circumstances, because the outcome of the hearing had no direct consequences for defendant, it cannot be said that defendant was a party to the PSC proceeding. At most it was an interested, albeit unwilling, participant in a public investigation of the Water Company's practices. *Id.* at 154, 531 N.Y.S.2d 876, 527 N.E.2d 754.

The court then concluded that "the absence of immediate consequences for defendant in the PSC proceeding calls into question whether the PSC determination was made in the context of an adjudicatory proceeding." *Id.* at 155, 531 N.Y.S.2d 876, 527 N.E.2d 754.

This Court finds the New York Court of Appeals' decision in *Staatsburg* to be highly persuasive. The most significant difference between *Staatsburg* and the facts at issue is that in *Staatsburg,* the defendant participated in the administrative hearing under protest, and did not devote the energy and resources that it may have expended in another forum. In the present case, both parties spent a substantial amount of time and effort presenting their respective cases to the ALJ. Nevertheless, the fact both Central Scott and Teleconnect cooperated fully with the ISUB does not change the fact the stakes are much higher in the action before this Court, which seeks a direct order for payment. *See id.* at 154, 531 N.Y.S.2d 876, 527 N.E.2d 754.

Following *Staatsburg,* as well as the United States Supreme Court's language in *IT & T,* this Court finds that the ISUB proceedings do not rise to the level of final "adjudication" necessary to invoke the doctrine of issue preclusion.[12] The Court recognizes,

---

12. Central Scott cites the Eighth Circuit's decision in *Richardson v. Phillips Petroleum Co.,* 791 F.2d 641, 646 (8th Cir.1986), which declined to give preclusive effect to a state administrative

and is troubled by, the duplication that will result in the event this case continues to trial. However, reasons of practicality cannot override the absence of a conclusive determination on which issue preclusion could rest. At most, Central Scott will have another opportunity to discuss the tariff language at issue, "and even then state administrative findings may be entered into evidence at trial." *Astoria Fed. Savs. & Loan Ass'n v. Solimino,* — U.S. at ——, 111 S.Ct. at 2172–73.

## IV. CONCLUSION

For the reasons outlined above, Teleconnect's motion for summary judgment is DENIED. The Court hereby REFERS this case to the Honorable Mark W. Bennett, United States Magistrate Judge, for a settlement conference.[13] All other proceedings are STAYED until an appropriate date to be determined by Judge Bennett.

IT IS SO ORDERED.

agency's decision on the basis that "there [was] more than a de minimis difference between the issue raised and the weight to be given the facts in the two actions." However, *Richardson* differs from the present case in that the agency in *Richardson* awarded injunctive relief, and thus, had some "immediate effect" on the parties. *See id.* at 645. This Court finds the facts in *Staats-*

*burg* to be much more similar, and thus, more persuasive.

13. Counsel should contact Judge Bennett's office, at (515) 284–6217, to arrange a time and date for the conference.