NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GREAT WESTERN PRODUCE,
INC., Respondent.

No. 87–7056.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 1987.

Decided Feb. 9, 1988.

Paul J. Spielberg, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Neil Vincent Wake, Michael R. Devitt, Mark C. Dangerfield, Beus, Gilbert, Wake & Morrill, Phoenix, Ariz., for respondent.

Before CHAMBERS, SCHROEDER and POOLE, Circuit Judges.

POOLE, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order requiring Great Western Produce, Inc. to bargain with Construction, Building Materials and Miscellaneous Drivers, Teamsters Local 83, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Great Western opposes the application for enforcement on the ground that the Board designated an inappropriate collective bargaining unit. We uphold the Board's determination and enforce the bargaining order.

I

Great Western maintains an integrated warehouse and office facility in Glendale, Arizona, where it is engaged in the wholesale distribution of produce. On December 30, 1985, Local 83 filed a representation petition, seeking an election to determine whether a designated unit of Great Western's employees, including warehousemen, drivers, and mechanics, but excluding inside salesmen, wished to be represented by Local 83. At the hearing on the petition, Great Western challenged the proposed unit, contending that its mechanics should be excluded, while its salesmen should be included.

On January 28, 1986, the Acting Director for Region 28 issued his Decision and Direction of Election, holding that the appropriate collective bargaining unit would include all full-time and part-time truck drivers, warehousemen, lumpers, mechanics, and repackers employed at the Glendale facility, but would exclude all salesmen, office clerical employees, guards, and supervisors.

The Acting Director found that Great Western employed approximately 15 warehousemen and 11 truck drivers, all supervised by Wayne Piziak. The warehousemen loaded and unloaded trucks, received and stocked produce, arranged the produce in the warehouse, and cleaned the warehouse. The truck drivers delivered produce to Great Western's customers. Both warehousemen and truck drivers were paid on an hourly basis.

The Acting Director further found that Great Western also employed five salesmen, who were supervised by its president and vice-president, Victor and Tony Crispo. The salesmen were paid on a salary basis, and spent most of their time at their desks in the office area of the facility. The salesmen contacted customers by telephone in an effort to sell produce. To facilitate price negotiations with prospective customers, the salesmen had to keep themselves informed as to current market conditions. Salesmen were familiar with the location of produce stored in the warehouse and monitored its quality. Salesmen also sold produce to "peddlers," a trade name given to persons who purchase damaged produce. A salesman would show a peddler the damaged produce in the warehouse, negotiate a price, and then help load the produce in order to make sure that the peddler re-

ceived the correct goods. However, the salesmen only infrequently assisted the warehousemen in their duties.

Based on these facts, the Acting Director found that the salesmen did not share a community of interest with the truck drivers and warehousemen, and excluded them from the bargaining unit. The Acting Director relied on the facts that the salesmen were paid differently, had a different supervisor and work location, and had minimal work-related contact with the drivers and warehousemen, and he concluded that any duties the salesmen performed in the warehouse were merely incidental to their primary duty to sell produce.

With respect to Great Western's two mechanics, the Acting Director found that they worked in a garage located next to the warehouse, and, like the warehousemen and drivers, were supervised by Piziak. Their duties included servicing and repairing the trucks used by the drivers, and the forklifts used by the warehousemen. The mechanics had the same fringe benefits as the warehousemen, except that Great Western also leased company uniforms for the mechanics' use. Although the mechanics seldom entered the warehouse, they used the same restroom and parking area as the truck drivers and warehousemen. Accordingly, the Acting Director found that the mechanics constituted an essential link in Great Western's warehouse and transportation activities and should be included in the bargaining unit. Inclusion of the mechanics in the unit was found particularly appropriate given that no other union sought to separately represent them.

On February 28, 1986, the Board denied Great Western's request for review of the Acting Director's decision. That same day, an election was held among the employees in the designated bargaining unit. The final result was twenty-two votes for Local 83 and seventeen against; the four challenged ballots remaining were too few to affect the outcome. On July 16, 1986, the Acting Director certified Local 83 as the exclusive representative of the employees in the designated unit, and ordered Great Western to engage in collective bargaining.

Great Western refused to bargain. On November 12, 1986, the Board issued a Decision and Order finding that Great Western's refusal to bargain was an unfair labor practice under sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), and ordering it to bargain with Local 83. On February 9, 1987, the Board petitioned this Court for enforcement of its order. We have jurisdiction pursuant to section 10(e) of the Act, 29 U.S.C. § 160(e).

## II

The Board's determination that a particular bargaining unit is appropriate will not be overturned unless the Board has abused its discretion. *Spring City Knitting Co. v. N.L.R.B.*, 647 F.2d 1011, 1013 (9th Cir.1981); *N.L.R.B. v. J.C. Penney Co.*, 620 F.2d 718, 719 (9th Cir.1980). The Board is not required to select the most appropriate bargaining unit so long as the unit chosen is within the range of units appropriate under the circumstances. *Spring City* at 1014, *J.C. Penney* at 719.

### A. *The Applicable Standard*

Although the Board is not strictly bound by its prior cases, it does have a duty to explain departures from established agency policy. *N.L.R.B. v. Albert Van Luit & Co.*, 597 F.2d 681, 686 n. 3 (9th Cir.1979). Great Western's first contention is that the Board abused its discretion when it failed to apply the standard for determining an appropriate bargaining unit enunciated in *A. Harris & Co.*, 116 N.L.R.B. 1628 (1956), without explaining why.

Generally, the standard for determining the appropriateness of a bargaining unit is whether the employees in the unit share a community of interest. *N.L.R.B. v. J.C. Penney Co.*, 620 F.2d 718, 719 (9th Cir.1980). In *Harris*, however, the Board held that three factors justified the establishment of a separate bargaining unit for the warehouse employees of a retail department store: (1) the warehouse employees had separate supervision from the retail store employees; (2) the warehouse em-

ployees performed substantially all of their work in buildings geographically separated from those in which the store's other employees were located; and (3) the warehouse employees were not integrated to any substantial degree with employees in other divisions in the performance of their ordinary duties. 116 N.L.R.B. at 1632. All three factors must be satisfied in order to justify a separate unit under *Harris. Roberds, Inc.*, 272 N.L.R.B. 1318, 1319 (1984); *Sears Roebuck & Co.*, 117 N.L.R.B. 133, 134 (1957).

■ The Board argues that the *Harris* standard applies only to requests for separate warehouse units in *retail* enterprises; thus, since the present case involves a *wholesale* enterprise, *Harris* is inapplicable. *See Roberds, Inc.*, 272 N.L.R.B. at 1318 (describing *Harris* as setting forth conditions for separate warehouse units in the retail store industry). The Board points to a number of decisions involving warehouse employees of wholesale enterprises in which the Board did not discuss or apply the *Harris* standard. *See, e.g., The Brescome Distributors Corp.*, 179 N.L.R.B. 787, 802 (1969) (wholesale wine/liquor distributor); *Alaska Fish and Farm Products, Inc.*, 212 N.L.R.B. 730 (1974) (wholesale food service business); *John G. Merkel & Sons, Inc.*, 232 N.L.R.B. 140, 149 (1977) (wholesale distributor of medical supplies and equipment).

In addition, the Board notes that Great Western's argument was implicitly rejected in *McKeesport Beer Distributor, Inc.*, 280 N.L.R.B. No. 126 (1986), *enforcement granted, N.L.R.B. v. McKeesport Beer Distributor, Inc.*, 815 F.2d 695 (3rd Cir.1987) (unpublished per curiam opinion). At issue in *McKeesport* was whether the salesmen employed by a company engaged primarily in the wholesale distribution of beer should be included in a bargaining unit of local drivers and warehousemen. The Regional Director held in an unpublished decision that the salesmen did not share a sufficient community of interest with the drivers and warehousemen to require their inclusion in the unit. The employer's suggestion that

the *Harris* standard should apply was rejected:

Cases relied upon by the Employer, such as *Barbara George Collection,* 273 NLRB No. 156 (Dec. 14, 1984); *NAPA Columbus Parts Co.,* 269 NLRB 1052 (1984); *Charette Drafting Supplies Corp.,* 275 NLRB No. 177 (July 31, 1985), are inapposite since those cases involved retail operations that were analyzed by the Board in accordance with the rationale set forth in *A. Harris & Co.,* 116 NLRB 1628 (1956). In *A. Harris,* the Board set forth certain conditions which must be met in order to establish the appropriateness of a separate warehouse unit in a retail facility.

*McKeesport Beer Distributor, Inc.*, Case No. 6–RC–9603, p. 11 (Region Six, October 18, 1985). The Board affirmed the Regional Director's decision. 280 N.L.R.B. No. 126 at 2.

Great Western correctly points out that the Board has applied the *Harris* standard to wholesale operations. *See Roskin Brothers, Inc.*, 274 N.L.R.B. 413 (1985) (wholesale sporting goods distributor; separate warehouse unit found inappropriate under *Harris*); *see also Napa Columbus Parts Co.*, 269 N.L.R.B. 1052 (1984) (retail and wholesale distributor of automotive replacement parts; separate warehouse unit found inappropriate under *Harris*). However, these decisions simply applied *Harris* without any examination of whether the standard should be extended from retail to wholesale operations. No established Board policy can be inferred from them.

Great Western asserts that *Consolidated Supply Co., Inc.*, 192 N.L.R.B. 982 (1971), expressly held that the *Harris* factors should be applied to a wholesale business. This reading of *Consolidated Supply* is inaccurate. In *Consolidated*, the Board applied *Harris* to hold that three sales clerks who worked in a store which was an extension of a warehouse should be included in a unit composed of warehousemen and drivers. Characterizing *Harris* as a rule which applied where a warehouse is an adjunct of a retail department store, the Board reasoned that the same rule should

apply where a store was an adjunct to a warehouse. *Id.* at 988. The Board did not, however, expressly hold that the *Harris* standard should be extended from retail to wholesale businesses.[1]

We are satisfied that the decision not to apply the *Harris* standard to a wholesale distributor such as Great Western was not a departure from an established agency policy requiring a reasoned explanation on the record.[2] Accordingly, we uphold the Board's use of the more general "community of interest" standard in determining the appropriate bargaining unit in this case.

### B. *The Bargaining Unit Determination*

In determining whether a sufficient community of interest exists among employees in a potential bargaining unit, the Board considers factors such as:

> (1) similarity in employee skills, duties, and working conditions; (2) integration of function and personnel; (3) employees organizational framework; (4) employee choice; (5) extent of union organization; (6) bargaining history.

*N.L.R.B. v. J.C. Penney Co., supra,* 620 F.2d at 719. We will review the Board's decision regarding each of the two disputed groups: salesmen and mechanics.

### 1. *Standard applied to salesmen*

■ The Board asserts that, as the salesmen are responsible for customer contact and setting the price of the produce sold, they have markedly different skills and duties from the warehousemen and truck drivers. It also asserts that the salesmen's working conditions are different, since they spend most of their time in the office and on the telephone. Moreover, the salesmen are paid a salary, whereas the drivers and warehousemen are paid an hourly wage, and the groups have different supervisors. The Board notes that the Acting Director found that the salesmen had "minimal

work-related contact" with the warehousemen and drivers, and that "any duties they perform in the warehouse are merely incidental to their selling responsibilities."

Great Western argues that the Board abused its discretion in finding that the salesmen did not share a community of interest with the drivers and warehousemen. It charges that the Acting Director's findings that salesmen infrequently assisted warehousemen in their duties, and had minimal work-related contact with the warehousemen and drivers, are not supported by substantial evidence on the record considered as a whole. *See Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Great Western concedes that two former employees testified that they had never seen a salesman help load a truck or pull an order, but argues that this testimony was not credible because the employees were bitter about their discharge. Great Western invites us to disregard this testimony in favor of testimony by other long-time employees that salesmen pull orders and occasionally make deliveries, that warehousemen sometimes assist salesmen in verifying the quality of produce as it is unloaded, and that drivers assist salesmen by phoning in to verify customer complaints. However, this testimony does not refute the Acting Director's finding that the salesmen spent *most* of their time in the office and on the phone to customers. As the Acting Director made a choice between two fairly conflicting views, his findings on this point must be upheld.

Great Western also attempts to show that salesmen, drivers, and warehousemen have a community of interest with respect to wages, benefits, and working conditions. Great Western emphasizes that salesmen, drivers, and warehousemen all wear casual dress, are paid according to the length of their service with the company, receive the

---

**1.** Indeed, although the Board described the sales clerks' duties as "comparable to taking orders at a counter in a wholesale operation," Consolidated sold to the general public as well as to restaurants and bars. Thus, as in *Napa,* the enterprise was, at least in part, a retail operation.

**2.** However, we suggest that clarification of the Board's approach to wholesale warehouse employees might eliminate the need for future litigation on this question.

same number of paid holidays, are covered by the company's worker's compensation policy, and are eligible to participate in pension and health care plans. However, unit determination is a matter committed to the Board's discretion. *N.L.R.B. v. Carson Cable TV*, 795 F.2d 879, 884 (9th Cir.1986). We cannot say that the Board abused its discretion in determining that these factors were less significant than the differences in working environment, duties, skills, supervision, and manner of compensation. *See Brescome*, 179 N.L.R.B. at 802 (salesmen separately supervised, paid on commission instead of by the hour, and only infrequently assisted in the warehouse); *Alaska Fish*, 212 N.L.R.B. at 730–31 (salesmen received salaries, were primarily engaged in soliciting business, and only occasionally made deliveries and filled orders); *Merkel*, 232 N.L.R.B. at 149 (salesmen's occasional performance of warehouse duties was incidental to their principal duty of communicating with customers).

### 2. *Standard applied to mechanics*

 Great Western contends that the mechanics do not have a community of interest with the warehousemen and drivers because they work in a separate garage, are involved exclusively with the maintenance of the trucks and forklifts, and wear company uniforms which "segregate" them from the other company employees. The Board counters by pointing out that the mechanics have the same supervisor as the drivers and warehousemen, use the same parking lot and restrooms, and, most importantly, are an essential link in Great Western's warehouse and transportation activities since they repair the drivers' trucks and the warehousemen's forklifts. We believe the Board's determination was appropriate under the circumstances. *See Indiana Refrigerator Lines, Inc.*, 157 N.L.R.B. 539, 550–51 (1966) (mechanics included in unit with drivers despite minimal interchange of employees and separate supervision); *Queen City Transports*, 141 N.L.R.B. 964, 972–73 (1963) (mechanics included in unit with drivers where both performed one integrated function under common supervision).

### CONCLUSION

Having determined that the bargaining unit approved by the Board was within the range of units appropriate under the "community of interest" standard, we grant the Board's petition to enforce its bargaining order.

### ORDER ENFORCED