**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION;
INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION, LOCAL 4,
                           *Petitioners*,

                v.

NATIONAL LABOR RELATIONS
BOARD,
                           *Respondent*,

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 48;
KINDER MORGAN TERMINALS,
                           *Intervenors*.

No. 19-70297

NLRB Nos.
19-CC-092816
19-CC-115273
19-CD-092820
19-CD-115274

NATIONAL LABOR RELATIONS
BOARD,
                                *Petitioner*,


                    v.


INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION;
INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION, LOCAL 4,
                            *Respondents.*

No. 19-70604

NLRB Nos.
19-CC-092816
19-CC-115273
19-CD-092820
19-CD-115274

PACIFIC MARITIME ASSOCIATION,
                            *Petitioner*,


                    v.


NATIONAL LABOR RELATIONS
BOARD,
                            *Respondent.*

No. 19-71471

NLRB Nos.
19-CC-092816
19-CC-115273
19-CD-092820
19-CD-115274

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted September 2, 2020
Seattle, Washington

Filed October 14, 2020

Before:  Michael Daly Hawkins and M. Margaret
McKeown, Circuit Judges, and Virginia M. Kendall,[*]
District Judge.

Opinion by Judge Hawkins

**SUMMARY**[**]

**Labor Law**

The panel granted petitions for review, denied the National Labor Relations Board's cross-petition for enforcement, and remanded for further proceedings in an intra-union dispute over the right to perform certain maintenance and repair ("M&R") work for Kinder Morgan Terminals at its Bulk Terminal facility in Vancouver, Washington.

In 2008, Local 4 of the International Longshore and Warehouse Union and the Pacific Maritime Association ("PMA") negotiated a collective bargaining agreement (CBA) in which PMA agreed to expand Longshoremen's jurisdiction to include additional work at facilities run by PMA members.  Kinder Morgan, a PMA member, had previously subcontracted the electrical M&R work at its Vancouver facility to a company that employed electricians represented by Local 48 of the International Brotherhood of

---

[*] The Honorable Virginia M. Kendall, United States District Judge for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Electrical Workers. The Longshoremen filed several grievances to enforce the new CBA when Kinder Morgan continued using Electrical Workers even after the CBA took effect. Kinder Morgan asked the Board to intervene. Agency and arbitral decisions ensued. Following a 2011 hearing under section 10(k) of the National Labor Relations Act (the "NLRA"), the Board awarded the disputed work to the Electrical Workers over the Longshoremen's defense that they were preserving work secured under the CBA.

The Longshoremen and PMA sought review of the Board's order rejecting the Longshoremen's work preservation defense, finding the Longshoremen in violation of the NLRA, and ordering them to cease all attempts to obtain the disputed work, to withdraw its grievances, and to request vacatur of their favorable arbitral award.

The panel reaffirmed the well-settled rule that 10(k) decisions are not res judicata in subsequent unfair labor practice proceedings. The panel held, therefore, that the Board erred in deeming its 10(k) decision dispositive of the Longshoremen's work preservation doctrine.

The panel rejected the Board's construction of the work preservation defense. The panel noted that the Supreme Court has disallowed a narrow focus on past performance of the precise work in dispute as ill-suited to a holistic, circumstantial inquiry required here where the parties have agreements aimed at preserving union jobs in the face of technological threats to traditional union work. The panel held that the Board erred by disregarding this binding precedent and instead making past performance of the specific work at issue the beginning and end of its analysis.

The panel held that the 2008 CBA encompassed the disputed work which both unions claimed. The panel further held that the plain language of the CBA unambiguously assigned to the Longshoremen all M&R work, on all present and future stevedore cargo handling—including its technological equipment and electronics—for all PMA members, at all West Coast ports. The panel held that the Board erred by using extrinsic evidence to inject ambiguity into the CBA's unambiguous terms and, by extension, assessing the Longshoremen's work preservation defense based on that erroneous construction.

**COUNSEL**

Eleanor Morton (argued) and Lindsay R. Nicholas, Leonard Cardner LLP, San Francisco, California, for Petitioners/Cross-Respondents International Longshore and Warehouse Union, and International Longshore and Warehouse Union, Local 4.

Michael E. Kenneally (argued) and Jonathan C. Fritts, Morgan Lewis & Bockius LLP, Washington, D.C., for Petitioner Pacific Maritime Association.

Heather S. Beard (argued), Attorney; Kira Dellinger Vol, Supervisory Attorney; David Habenstreit, Assistant General Counsel; Meredith Jason, Acting Deputy Associate General Counsel; Alice B. Stock, Deputy General Counsel; Peter B. Robb, General Counsel; National Labor Relations Board, Washington, D.C.; for Respondent.

Elizabeth Joffe (argued), McKanna Bishop Joffe LLP, Portland, Oregon, for Intervenor International Brotherhood of Electrical Workers, Local 48.

David L. Schenberg and Timothy A. Garnett, Ogletree Deakins Nash Smoak & Stewart P.C., St. Louis, Missouri, for Intervenor Morgan Kinder.

Kevin Marrinan and John P. Sheridan, Marrinan & Mazzola Mardon P.C., New York, New York, for Amicus Curiae International Longshoremen's Association, AFL-CIO.

Robert H. Lavitt, Barnard Iglitzin & Lavitt LLP, Seattle, Washington, for Amici Curiae Maritime Union of Australia, and International Transport Workers' Federation.

**OPINION**

HAWKINS, Circuit Judge:

We address a years-long intra-union dispute over the right to perform certain maintenance and repair (M&R) work for Kinder Morgan Terminals (Kinder Morgan) at its Bulk Terminal facility in Vancouver, Washington. In 2008, Local 4 of the International Longshore and Warehouse Union (the Longshoremen)[1] and the Pacific Maritime Association (PMA), an association of West Coast port operators, negotiated a collective bargaining agreement (CBA) with the Longshoremen in which they agreed to offset anticipated future losses of longshore jobs to automation by expanding the Longshoremen's jurisdiction to include additional work at facilities run by PMA members. One such member, Kinder Morgan, had previously subcontracted the electrical

---

[1] The union's international organization is also a Petitioner. Since their differences are immaterial here, and for ease of reference, we refer to them collectively as "the Longshoremen" and to their members as "Longshoremen."

M&R work at its Vancouver facility to a company that employed electricians represented by Local 48 of the International Brotherhood of Electrical Workers (the Electrical Workers).[2]  Relying on CBA language that covered the work in question, the Longshoremen filed several grievances to enforce the new CBA when Kinder Morgan continued using Electrical Workers even after the agreement took effect.  When the Electrical Workers responded by threatening to picket the Vancouver facility, Kinder Morgan asked the National Labor Relations Board (the Board) to intervene.

A cacophony of agency and arbitral decisions ensued. Following a 2011 hearing under section 10(k) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(k), the Board awarded the disputed work to the Electrical Workers over the Longshoremen's defense that they were preserving work secured under the new CBA.  Meanwhile, the arbitrator assigned to the Longshoremen's grievances found as a matter of contract interpretation that the CBA covered the disputed work.  As the Longshoremen took steps to enforce their arbitral victory, the Electrical Workers filed unfair labor practices (ULP) charges, and the Board filed a complaint alleging that the Longshoremen's continued pursuit of the disputed work violated section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4).  In 2014, an administrative law judge (ALJ), after a seven-day hearing, found the Longshoremen's actions were aimed at preserving bargained-for work and dismissed the complaint.

Five years later, the Board disagreed.  Reversing the ALJ, the Board again rejected the Longshoremen's work

---

[2] In addition to referring to the union organization as "the Electrical Workers," we similarly refer to its members as "Electrical Workers."

preservation defense, found them in violation of the NLRA, and ordered them to cease all attempts to obtain the disputed work, to withdraw its grievances, and to request vacatur of their favorable arbitral award. The Longshoremen and PMA[3] now seek review of this order, and, in a counter-petition, the Board seeks its enforcement.[4]

We resolve three issues here. *First*, we reaffirm the well-settled rule that 10(k) decisions are not res judicata in subsequent ULP proceedings. Indeed, our and the Board's own case law expressly allow parties in ULP proceedings to relitigate arguments previously rejected in 10(k) decisions. We therefore hold that the Board erred in deeming its 10(k) decision "dispositive" of the Longshoremen's work preservation defense. *Second*, we reject the Board's construction of the work preservation defense. The Supreme Court has twice disallowed such a narrow focus on past performance of the precise work in dispute as ill-suited to the holistic, circumstantial inquiry that is indispensable where, as here, parties strike agreements aimed at preserving union jobs in the face of technological threats to traditional

---

[3] We previously denied without prejudice the Board's motion to dismiss PMA's petition because it was not a party to the underlying proceedings. The Board has since conceded the petition's timeliness and declined to renew its motion "because PMA makes essentially the same arguments as ILWU, which undisputably has standing." We do not address it further.

[4] On July 2, 2019, we consolidated the Longshoremen's and PMA's petitions for review and the Board's cross-petition for enforcement—all of which arise from the same Board order. We also granted Kinder Morgan and the Electrical Workers leave to intervene, and each has filed a brief in support of the Board's cross-petition. Finally, we granted leave to the Maritime Union of Australia and the International Longshoremen's Association, AFL-CIO, to participate as amici, and each has filed an amicus brief in support of the petitions for review.

union work. We hold that the Board erred by disregarding this binding precedent and instead making past performance of the specific work at issue the beginning and end of its analysis. *Third*, we hold that the 2008 CBA encompasses the disputed work which both unions claim. Subject only to exceptions not at issue here, the plain language of the agreement unambiguously assigns to the Longshoremen all M&R work, on all present and future stevedore cargo handling equipment—including its technological equipment and electronics—for all PMA members, at all West Coast ports. The Board erred by using extrinsic evidence to inject ambiguity into the CBA's unambiguous terms and, by extension, assessing the Longshoremen's work preservation defense based on that erroneous construction.

Accordingly, we grant the petitions for review, deny the cross-petition for enforcement, vacate the Board's order, and remand for further proceedings.

## BACKGROUND

The Longshoremen and PMA have a decades-long collective bargaining relationship. *Int'l Longshoremen's & Warehousemen's Union* (*Cal. Cartage*), 208 NLRB 986, 987 (1974). The Longshoremen have represented a coastwide collective bargaining unit of longshore workers at West Coast ports since 1938. *Shipowners' Ass'n of the Pac. Coast*, 7 NLRB 1002, 1025 (1938). As a multiemployer association whose members, including Kinder Morgan, employ Longshoremen at ports along the West Coast, PMA is responsible for negotiating and administering CBAs on its members' behalf. Kinder Morgan operates marine terminals at several West Coast ports, including its Vancouver facility, which it has operated since the 1990s. *Int'l Brotherhood of Elec. Workers, Local 48* (*IBEW*), 357 NLRB 2217, 2217 (2011).

Virtually all longshore work at West Coast ports is covered by a single CBA called the Pacific Coast Longshore Contract Document (PCLCD). Most relevant for our purposes is the version negotiated in 2008—specifically, its terms addressing the anticipated introduction of labor-saving automation technologies at West Coast ports. The language in section 1.71 of the agreement remained the same as in previous iterations, providing that the PCLCD "shall apply to the maintenance and repair of all stevedore cargo handling equipment." The parties then added two new provisions. In section 1.72, the Longshoremen and PMA stipulated:

> It is recognized that the introduction of new technologies, including fully mechanized and robotic-operated marine terminals, necessarily displaces traditional longshore work and workers, including the operating, maintenance and repair, and associated cleaning of stevedore cargo handling equipment. The parties recognize robotics and other technologies will replace a certain number of equipment operators and other traditional longshore classifications. It is agreed that the jurisdiction of the ILWU shall apply to the maintenance and repair of all present and forthcoming stevedore cargo handling equipment in accordance with Sections 1.7 and 1.71 and shall constitute the functional equivalent of such traditional ILWU work.

And in section 1.73, they further agreed that

> [t]he scope of work shall include . . . maintenance and repair . . . of all present and

forthcoming technological equipment related to the operation of stevedore cargo handling equipment (which term includes containers and chassis) and its electronics, that are controlled or interchanged by PMA companies, in all West Coast ports.

Simply put, the parties decided that PMA members could increase their use of automated equipment, and in exchange, the Longshoremen's jurisdiction would expand to offset the corresponding loss of traditional longshore work.[5]

This case emanates from conflicting constructions of these new terms—specifically, whether they encompass the disputed work at Kinder Morgan's Vancouver facility. Before 2008, Kinder Morgan had subcontracted such work to a subcontractor which employed workers under its own CBA with the Electrical Workers. *See ILWU*, 367 NLRB

---

[5] For PMA members that already had contracts with other unions, Section 1.81 of the PCLCD states that

ILWU jurisdiction of maintenance and repair work shall not apply at those specific marine terminals that are listed as being "red-circled" in the July 1, 2008 Letter of Understanding on this subject. Red-circled facilities, as they are modified/upgraded (e.g., introduction of new technologies), or expanded, while maintaining the fundamental identity of the pre-existing facility, shall not result in the displacement of the recognized workforce and shall not be disturbed, unless as determined by the terminal owner or tenant.

Since the Board found that the 2008 PCLCD does not encompass the disputed work, it did not decide whether Section 1.81 excludes electrical M&R work performed at Kinder Morgan's Vancouver facility from the Longshoremen's jurisdiction. *See Int'l Longshore & Warehouse Union* (*ILWU*), 367 NLRB No. 64 (Jan. 31, 2019).

No. 64, slip op. at 2. When this arrangement continued beyond the 2008 PCLCD's operational date, the Longshoremen filed several grievances arguing that Kinder Morgan's use of Electrical Workers violated sections 1.71 through 1.73 of the agreement. The Longshoremen's local president also penned a letter demanding that Kinder Morgan hire Longshoremen to perform the disputed work. The Electrical Workers responded by threatening to picket the Vancouver facility if Kinder Morgan capitulated to the Longshoremen's demands.[6] Caught in the middle, Kinder Morgan then filed charges against the Electrical Workers with the Board and requested a 10(k) hearing, *see* 29 U.S.C. § 160(k).

On December 31, 2011, the Board issued its 10(k) determination. After a three-day hearing and briefing from Kinder Morgan, the Electrical Workers, and the Longshoremen, the Board awarded the disputed work to the Electrical Workers. *IBEW*, 357 NLRB at 2221. Citing the unions' competing claims to the same work, the Electrical Workers' use of picketing threats against Kinder Morgan, and the absence of an agreed-upon method to resolve the dispute, the Board made its threshold finding of a bona fide jurisdictional dispute. *Id.* at 2218. It then rejected the Longshoremen's defense that they had acted lawfully to preserve work bargained for under the 2008 PCLCD. The Board instead noted the disputed work's past performance

---

[6] The Longshoremen and PMA question the sincerity of the Electrical Workers' picketing threats by claiming that Kinder Morgan and the Electrical Workers concocted a superficially jurisdictional dispute to invite Board intervention. The Board twice rejected, and the ALJ did not consider, this argument. *See IBEW*, 357 NLRB at 2218; *ILWU*, 367 NLRB No. 64, slip op. at 5 n.6. Because we vacate the Board's order based on antecedent legal errors, we, too, decline to address it.

by Electrical Workers, a concomitant lack thereof by the Longshoremen, and an absence of contractual language explicitly assigning *electrical* maintenance work to the Longshoremen. *Id.* at 2218–19. It then discounted the language in sections 1.71 through 1.73 as too "general" to support the work's reassignment to the Longshoremen, credited Kinder Morgan's preference for Electrical Workers, dismissed the Longshoremen's evidence of past performance of electrical M&R work as too sparse, noted Electrical Workers' superior skills and training, and thus deemed their continued use more economical. *Id.* at 2219–20.

The Area Arbitrator assigned to the Longshoremen's earlier-filed grievances reached the opposite conclusion.[7] On February 21, 2012, the arbitrator issued an award finding that the Longshoremen's jurisdiction under the 2008 PCLCD encompasses the disputed work and referred the matter to the Coast Labor Relations Committee (CLRC), which ordered Kinder Morgan to "take the necessary steps to assign the work in dispute" to Longshoremen. Over the next several months, Kinder Morgan and the Longshoremen worked with the CLRC to implement the order, including preparing job postings for the work in question and interviewing Longshoremen candidates. While that was being accomplished, Kinder Morgan continued sending the work to its subcontractor and its Electrical Workers, to which the Longshoremen responded by physically

---

[7] The designated Area Arbitrator had originally found that a July 28, 2008 Letter of Understanding (LOU) exempted Kinder Morgan's Vancouver facility from the relevant provisions of the PCLCD. On appeal, however, the Coast Arbitrator concluded that the LOU included no such exemption and remanded to the Area Arbitrator.

obstructing Electrical Workers' access to the Vancouver facility.

On November 8, 2012, the Electrical Workers went back to the Board and filed ULP charges against the Longshoremen. On June 28, 2013,[8] the Board filed a complaint alleging that the Longshoremen's actions violated section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). The Board based its allegations on the Longshoremen's failure to withdraw its grievances, its efforts to enforce its favorable arbitral award, and its attempts to prevent Electrical Workers from performing electrical M&R work at Kinder Morgan's Vancouver facility.

An ALJ dismissed the complaint on August 13, 2013. Following a seven-day hearing, the ALJ found that (1) Longshoremen had previously performed electrical M&R work at "numerous" PMA-affiliated facilities; (2) contrary to the Board's 10(k) decision, the 2008 PCLCD encompasses both present and future electrical M&R work, including the disputed work here; (3) the work preservation doctrine recognizes the validity of such agreements; and (4) Kinder Morgan, as a PMA member, is bound by its terms.

The Board disagreed. On January 31, 2019, it reversed the ALJ's dismissal and found that the Longshoremen's use of the grievance process and physical obstruction of jobsites constituted ULP under the NLRA. The Board began by stating that its initial 10(k) decision precluded the Longshoremen from reasserting its work preservation defense against the ULP charges. It also rejected the ALJ's

---

[8] After amending its complaint several times, the Board filed the operative consolidated complaint on October 22, 2013.

finding of past performance of the disputed work by Longshoremen, as well as the ALJ's constructions of the PCLCD and the work preservation doctrine. The Board then ordered the Longshoremen to cease and desist from said activities, to withdraw its grievances against Kinder Morgan, and to request vacatur of the arbitrator's decision concluding that the terms of the 2008 PCLCD encompass electrical M&R work.

These petitions for review and cross-petition for enforcement followed.[9]

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the petitions and cross-petition under 29 U.S.C. § 160(e) and (f). We will enforce the Board's order if it "correctly applied the law and if its factual findings are supported by substantial evidence in the record as a whole." *Plaza Auto Ctr., Inc. v. NLRB*, 664 F.3d 286, 291 (9th Cir. 2011) (quotation marks omitted). While we accord the Board's interpretations of the NLRA "considerable deference," *Recon Refractory & Constr., Inc. v. NLRB*, 424 F.3d 980, 987 (9th Cir. 2005) (quotation marks omitted), its legal interpretations generally must follow Supreme Court and circuit case law, *NLRB v. Ashkenazy Prop. Mgmt. Corp.*, 817 F.2d 74, 75 (9th Cir. 1987), and absent explanation, adhere to its own precedent, *NLRB v. Great W. Produce, Inc.*, 839 F.2d 555, 557 (9th Cir. 1988). Substantial evidence supports a factual finding if a

---

[9] The Longshoremen and PMA filed their petitions on February 1 and June 13, 2019, respectively, and the Board filed its cross-petition on March 28, 2019.

reasonable juror could have reached the Board's conclusion. *Plaza Auto*, 664 F.3d at 291.

## ANALYSIS

Congress enacted the ULP provisions in section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4), to protect "neutral employer[s]" caught between competing unions. *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 625–26 (1967). We limit our discussion to one of these provisions.[10] Subsection (D) makes it a ULP for a union to threaten or coerce any person with the object of "forcing or requiring any employer to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization." 29 U.S.C. § 158(b)(4)(D).

"Section 8(b)(4)(D), however, must be read in light of [section] 10(k) with which it is interlocked." *NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116, 123 (1971). If the Board has reasonable cause to believe section 8(b)(4)(D) was violated, *Int'l Tel. & Tel. Corp. v. Local 134, Int'l Brotherhood of Elec. Workers* (*ITT*), 419 U.S. 428, 445 n.16 (1975), section 10(k) "empower[s] and direct[s]" the Board "to hear and determine" the dispute unless the parties can timely demonstrate that "they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute." 29 U.S.C. § 160(k). This scheme encourages the swift, often

---

[10] Although the underlying complaint alleges that the Longshoremen's actions violated Section 8(b)(4)(ii)(B) and (D), the Board's analysis focuses almost entirely on subsection (D), save for a two-sentence paragraph at the end stating that the same actions by the Longshoremen also violated subsection (B)'s secondary boycott prohibition. *See ILWU*, 367 NLRB No. 64, slip op. at 8. Because the latter finding depends entirely on the Board's erroneous application of subsection (D), we do not address subsection (B) separately here.

informal resolution of disputes by giving the parties a sort of "advisory opinion" that previews the Board's probable assessment of the merits before the long slog of formal ULP proceedings begins in earnest. *ITT*, 419 U.S. at 446; *see also id.* at 441–47 (describing purpose, function, and limitations of 10(k) proceedings). It is not, however, a binding, final disposition. *Id.* at 444.

## I. The Board's 10(k) Decision Does Not Bar Re-Litigation of the Longshoremen's Work Preservation Defense

We begin with the Board's determination that its 10(k) decision precluded the Longshoremen from reasserting their work preservation defense in the subsequent ULP proceeding. The Board found its prior decision "dispositive of the question whether the Longshoremen had a valid work preservation objective" and deemed the Longshoremen's continued invocation of the defense an invalid attempt "to relitigate the Board's assignment of the disputed electrical M&R work to IBEW-represented employees." Though it now calls this finding "largely immaterial" given its purported reconsideration of the 10(k) decision later in the order, the Board still maintains that it "reasonably relied on precedent precluding such re-litigation." Not as we see it.

The Supreme Court has long held that "[t]he findings and conclusions in a [section] 10(k) proceeding are not res judicata on the unfair labor practice issue in the later [section] 8(b)(4)(D) determination." *ITT*, 419 U.S. at 446. If a union does not follow the Board's 10(k) decision, "the Board must prove [by a preponderance of the evidence] the union guilty of a [section] 8(b)(4)(D) violation before a cease-and-desist order can issue." *Plasterers' Local*, 404 U.S. at 122 n.10. This typically entails revisiting some of the arguments rejected during a 10(k) proceeding, at which

time the Board need only have found reasonable cause to believe section 8(b)(4)(D) was violated before issuing an award. *See id.*; *ITT*, 419 U.S. at 445 n.16. "Indeed, reconsideration of [section] 10(k) rulings appears implicitly contemplated by the statutory scheme, given that a [section] 8(b)(4)(D) proceeding involves a full adversarial adjudication, in contrast with the informal proceedings required under [section] 10(k)." *Pac. Maritime Ass'n v. NLRB* (*PMA*), 827 F.3d 1203, 1211 (9th Cir. 2016).

Board case law has long observed this anti-preclusion rule. *See Longshoremen ILWU Local 6* (*Golden Grain*), 289 NLRB 1, 2 (1988) ("[W]e overrule prior Board cases to the extent they suggest that a respondent in an 8(b)(4)(D) proceeding is not entitled to relitigate factual issues concerning the elements of the 8(b)(4)(D) violation that were raised in an underlying 10(k) proceeding unless it presents new or previously unavailable evidence."); *accord Plumbers Local 290* (*Streimer Sheet Metal Works*), 323 NLRB 1101, 1101 n.3 (1997) ("In light of the Respondent's election . . . to relitigate the unfair labor practice issue, we find no need to review the Board's decision reached under a different evidentiary standard in the Sec. 10(k) proceeding."); *Tile, Marble, Terrazzo Finishers & Shopworkers, Local 47-T* (*Grazzini Bros.*), 315 NLRB 520, 521 (1994) ("[A] respondent is entitled to a hearing . . . if the respondent denies the existence of an element of the 8(b)(4)(D) violation, either directly or by raising an affirmative defense."); *Teamsters Local 216* (*Granite Rock Co.*), 296 NLRB 250, 250 (1989) ("[A] respondent may relitigate factual issues concerning the elements of the 8(b)(4)(D) violation that were raised in the underlying 10(k) proceeding."). Yet the Board offered no explanation before it departed from that rule here. *See Great W. Produce*, 839 F.2d at 557. Nevertheless, that does not end our analysis.

Even as it has eschewed giving certain findings in 10(k) decisions res judicata effect, the Board has concurrently maintained that parties cannot "relitigate threshold matters that are not necessary to prove an 8(b)(4)(D) violation." *Golden Grain*, 289 NLRB at 2 n.4. Albeit passingly, the Board seizes upon such language here by suggesting that it reasonably relied on this rule in barring re-litigation of the Longshoremen's work preservation defense in the subsequent ULP proceedings. We disagree.

The "threshold matters" mentioned in *Golden Grain* refer to the initial jurisdictional assessment. Indeed, the decision's immediately subsequent reference to "the threshold issue of whether there had been an agreed method of settlement," *see id.*, points directly to the initial "three-step inquiry" used to determine whether there is a valid jurisdictional dispute warranting Board intervention under section 10(k), *see Recon Refractory*, 424 F.3d at 988. This threshold inquiry asks whether "(1) a union has used a proscribed means—such as picketing or threatening to picket—to enforce its claim to the work in dispute; (2) there are competing claims to the disputed work between rival groups of employees; and (3) there is no agreed-upon method for resolving the dispute voluntarily." *Id.* If the Board answers each of these in the affirmative, it then proceeds to the heart of the 10(k) inquiry by awarding the disputed work "based on considerations such as the employer's past practice, industry custom, and contract rights." *Id.*

This is not merely the most reasonable reading of a "threshold matters" exception, but the only one that rests within the bounds set by our previous decisions and those of the Supreme Court. *See ITT*, 419 U.S. at 446; *PMA*, 827 F.3d at 1211. Not so of the Board's preferred approach,

which would effectively nullify *Golden Grain*'s distinction of some issues as "threshold" by converting the entire 10(k) process into a threshold inquiry, and by extension, creating an exception that swallows the anti-preclusion rule. *See Ashkenazy Prop.*, 817 F.2d at 75.

The Board fell into this very trap in *Grazzini Brothers*, upon which the Board now relies in defending its use of a more expansive exception. There, after acknowledging the anti-preclusion rule, the Board nevertheless granted dispositive weight to the findings supporting its earlier 10(k) award—in that instance, concerning the existence of a CBA between the respondent and the employer. 315 NLRB at 521–22. Citing its "well settled" rule that a party cannot relitigate a 10(k) work assignment in a later ULP proceeding,[11] the Board announced that "[i]t logically follows that a party cannot relitigate the various factors, including the existence or nonexistence, of a collective-bargaining agreement, that the Board considers in making its 10(k) determination." *Id.* at 522. Addressing *Golden Grain*'s "threshold matters" exception in a footnote, the Board simply stated that barring re-litigation of the factors going to the merits of a 10(k) award "is consistent with the Board's holding that it will not permit renewed litigation of threshold or preliminary matters not necessary to prove an 8(b)(4)(D) violation." *Id.* at 522 n.7. Not really.

We begin by noting the rather breathtaking scope of such an exception. The entire 10(k) proceeding consists of two components: an initial jurisdictional finding and an award

---

[11] Because Board case law explicitly excludes affirmative defenses from those "threshold matters" excepted under *Golden Grain*, we need not address the Board's potentially narrower rule against relitigating 10(k) work assignments.

based on considerations like past practice, industry custom, and CBAs. *See Recon Refractory*, 424 F.3d at 988. If, as *Grazzini Brothers* suggests, *Golden Grain*'s bar on relitigating "threshold matters" encompasses both parts, then the anti-preclusion rule loses all practical meaning. But that is not the case.

Nothing in *Golden Grain* supports the more expansive "threshold matters" exception that the Board recognized in *Grazzini Brothers* and now relies upon here. To the contrary, *Golden Grain* and its progeny reinforce our stated view that the exception refers exclusively to the Board's initial jurisdictional inquiry. *See* 289 NLRB at 2 n.4 (using "agreed upon method of settlement" inquiry as example of a "threshold matter"); *Granite Rock Co.*, 296 NLRB at 250 n.2 (same); *Streimer Sheet Metal Works*, 323 NLRB at 1103–04 ("[W]hile I am bound by the Board's 10(k) findings as to certain 'threshold matters,' I am nevertheless required to judge the lawfulness of the picketing in the light of the parties' 'relitigation' during this trial of certain 'factual issues concerning the elements of the [alleged] 8(b)(4)(D) violation,' *including their relitigation of certain matters as to which the Board made findings in the 10(k) decision*, and on which the General Counsel now relies as evidence that the picketing had a 'proscribed,' work-reassignment 'object.'" (emphasis added, footnote omitted)); *Architectural Metal Workers Local 513* (*Custom Contracting*), 292 NLRB 792, 793 (1989) ("The Respondent's affirmative defense does not raise such purely preliminary or threshold matters. This would be the case had the Respondent asserted that the Employer did not meet the Board's jurisdictional standards."). Thus, even if we were to accept the Board's claim that its 10(k) work assignments are unreviewable, *see Grazzini Bros.*, 315 NLRB at 522, that presumption necessarily excludes those parts of the 10(k)

determination that go to the merits of subsequent ULP
charges, including affirmative defenses like work
preservation. *See id.* at 521 ("[A] respondent is entitled to a
hearing . . . if the respondent denies the existence of an
element of the 8(b)(4)(D) violation, either directly or by
raising an affirmative defense.").

In sum, the Board's expansion of the "threshold matters"
exception in *Grazzini Brothers* and its later reliance on the
same here find no support in the precedents of the Supreme
Court, of this Court, or of the Board itself. And in neither
instance did the Board either distinguish its finding from the
anti-preclusion rule, *see Ashkenazy Prop.*, 817 F.2d at 75, or
explain its departure from the narrower construction
advanced by the *Golden Grain* line of cases, *see Great W.
Produce*, 839 F.2d at 557. We therefore hold that the Board
erred in finding its 10(k) determination dispositive of the
Longshoremen's work preservation defense, and we
overrule *Grazzini Brothers* to the extent it holds to the
contrary.[12]

## II. The Board's Application of the Work Preservation Doctrine

We turn next to the Board's analysis of the
Longshoremen's work preservation defense. Unmoved by
the Board's preclusion argument, the ALJ proceeded to the
merits and found that the Longshoremen's negotiation of and

---

[12] The Board also refused to consider the Longshoremen's collusion
argument, *see supra* note 5, based on the Board's erroneous conclusion
that its 10(k) determination precluded the issue's reconsideration during
the ULP proceedings. It did not, however, offer an alternative analysis
of the argument as it did with the Longshoremen's work preservation
defense. We therefore decline to address the issue before remanding to
the Board for consideration under the appropriate legal standard.

attempts to enforce the 2008 PCLCD had aimed "to limit the more recent outsourcing of unit jobs to nonunit employees in order to diminish these looming adverse consequences on unit employees who face the loss of the jobs they have been performing for years." When the Board reversed, it followed its initial preclusion finding with an alternative analysis concluding that the ALJ had misconstrued the work preservation doctrine; that the relevant terms of the 2008 PCLCD do not encompass the disputed work; and that only the electrical M&R work performed at Kinder Morgan's Vancouver facility was relevant to the Longshoremen's defense. This was also error.

A valid work preservation objective provides a complete defense against alleged violations of section 8(b)(4)(D), as well as against jurisdictional disputes under section 10(k). *See Nat'l Woodwork*, 386 U.S. at 644–46; *Recon Refractory*, 424 F.3d at 988–89. "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis his own employees." *Nat'l Woodwork*, 386 U.S. at 645. "The effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer." *NLRB v. Int'l Longshoremen's Ass'n* (*ILA I*), 447 U.S. 490, 507 n.22 (1980); *accord The N.Y. Presbyterian Hosp.*, 354 NLRB 71, 77 (2009) ("[U]nions and employers are entitled to negotiate contracts that 'preserve' unit work by way of no-subcontracting or similar clauses, *even if the enforcement of such agreements may cause the contracting employer to cease doing business with someone else*."). In a word, the dispositive measure is purpose, not effect.

## A.  The Board's Doctrinal Framework

The first friction point concerns the contours of the work preservation doctrine itself.  Central to this dispute are the parties' assessments of the Supreme Court's elaboration of the doctrine in *ILA I* and *NLRB v. International Longshoremen's Association* (*ILA II*), 473 U.S. 61 (1985). The Longshoremen and PMA predictably prefer the ALJ's view, which characterized these cases as a rejection of "the Board's highly restrictive view that the work preservation doctrine is confined only to work traditionally performed by unit employees."  The Board meanwhile falls back on its own view that these cases examine only "one aspect of the work preservation doctrine—identifying the 'work in controversy' in a 'complex case of technological displacement'"—and thus offer little assistance here.  In fact, the *ILA* cases are not unlike this one.

In *ILA I*, the Court began by reiterating a two-part test for determining whether a CBA provision constitutes a lawful work preservation agreement.  The first part requires that the agreement "have as its objective the preservation of work traditionally performed by employees represented by the union."  *ILA I*, 447 U.S. at 504.  The second provides that "the contracting employer must have the power to give the employees the work in question," or rather, the "right of control."  *Id.*  "The rationale of the second test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work."  *Id.* at 504–05.

The sticking point in *ILA I* was the doctrine's application in cases where, as here, "employees' traditional work is displaced, or threatened with displacement, by technological innovation."  *Id.* at 505.  Because the union workers there

had never performed the precise work at issue at the precise location in question, the Board found that the union's objective had been work acquisition rather than work preservation, and thus, secondary in nature. *Id.* at 506. The Court disagreed. Since technology often alters altogether the way that work gets done, the Court explained that the doctrine "must also apply to situations where unions attempt to accommodate change while preserving as much of their traditional work patterns as possible." *Id.* at 506. Otherwise, only those agreements that "respond to change with intransigence" would be valid—something Congress had never intended. *Id.*

The Court instead advanced a more holistic approach to defining disputed work. That assessment requires "a careful analysis of the traditional work patterns that the parties are allegedly seeking to preserve, and of how the agreement seeks to accomplish that result under the changed circumstances created by the technological advance." *Id.* at 507. The greater the complexity, the broader the industrial and vocational scope of the analysis. *Id.* But in all cases, the focus must be "on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work," and on how the agreement attempts to preserve jobs impacted by the introduction of new technologies. *Id.*

Five years later, the Court in *ILA II* repudiated once more the Board's preoccupation with "employees outside the bargaining unit." 473 U.S. at 82. First, the Court familiarly renounced concerns with the "extra-unit effects" of an otherwise legitimately motivated agreement. *Id.* at 79. There was no question that the union's motive for executing the agreement was preserving its members' jobs, and thus, no reasonable inference of aggrandizement was to be

gleaned from evidence of the agreement's effects on others. *Id.* Second, the Court rejected the Board's understanding that work eliminated by innovation cannot possibly be preserved. *Id.* at 80–81. But as the Court observed, job elimination itself often forms the impetus for such agreements. *Id.* Thus, the relevant inquiry must remain whether

> a union's activity is primary or secondary— that is, whether the union's efforts are directed at its own employer on a topic affecting employees' wages, hours, or working conditions that the employer can control, or, instead, are directed at affecting the business relations of neutral employers and are "tactically calculated" to achieve union objectives outside the primary employer-employee relationship.

*Id.* at 81. Of course, the "preservation/acquisition dichotomy" might still, in certain cases, help to detect tactical agreements aimed at acquiring work even absent any threat of job losses. *Id.* at 79 n.19. The Board's error there was making acquisition a talisman. As happened here.

Two compounding errors beset the Board's work preservation analysis. It erred first by deeming the *ILA* cases inapplicable here. Neither case suggests its work preservation framework should be reserved only for particularly complex cases of technological displacement. To the contrary, *ILA I* specifically contemplates its application to both the "simple case" and "more complex cases." 447 U.S. at 507. "Whatever its scope," the inquiry remains the same: focused on bargaining unit workers rather than non-unit workers currently doing the same or similar

work; unconcerned with the work's precise location; and accommodative toward change (or even the threat of change), including the elimination of traditional work. *See id.* at 505, 507–08 & n.22; *ILA II*, 473 U.S. at 79–82.

The Board subsequently erred by limiting its work preservation inquiry to whether Longshoremen had historically performed electrical M&R work at Kinder Morgan's Vancouver facility. The *ILA* cases underscore the primacy of the work preservation agreement's purpose, even if its enforcement comes at a cost to extra-unit workers. For the ALJ, the terms of the PCLCD left little doubt about the Longshoremen's intent—perhaps most notably, the parties' mutual anticipation of robotics- and other technology-inflicted displacements of existing longshore work under section 1.72. If the PCLCD indeed covers the disputed work, then it at least stands to reason that the Longshoremen sought the disputed work, not to achieve some unrelated union objective or to inflict harm on Electrical Workers or the subcontractor that employed them, but "to limit the more recent outsourcing of unit jobs to nonunit employees in order to diminish these looming adverse consequences on unit employees who face the loss of the jobs they have been performing for years." *See ILA II*, 473 U.S. at 79 n.19 ("An agreement bargained for with the objective of work preservation in the face of a genuine job threat . . . is not 'acquisitive' . . . even though it may have the incidental effect of displacing work that otherwise might be done elsewhere or not be done at all."). The Board's order does not mention this possibility, much less address it.

Instead, the Board appears to have fallen "into the same analytical trap" about which the *ILA* cases warn. *See ILA II*, 473 U.S. at 82. Its ULP order is preoccupied with the precise location of the disputed work and with those non-unit

employees who stood to lose work were it to enforce the Longshoremen's (and PMA's) interpretation of the PCLCD. *See ILA I*, 447 U.S. at 506–08; *ILA II*, 473 U.S. at 79. So, too, of its initial 10(k) decision. *See IBEW*, 357 NLRB at 2218–19. As a result, neither engages the fundamental inquiry of work preservation—namely, whether the Longshoremen negotiated and attempted to enforce the 2008 PCLCD in pursuit of a primary or secondary purpose. *See ILA II*, 473 U.S. at 81. The Board instead employs the same "wooden application" of the preservation/acquisition dichotomy, wherein the Longshoremen's purpose is presumed secondary once it is determined that Longshoremen have not performed the precise work in question, irrespective of the parties' contractually enshrined aim of preempting automation-induced job losses. *See ILA II*, 473 U.S. at 80 n.19; *cf. id.* at 75–76 (secondary purpose possible where "union engaged in activity to reach out to monopolize jobs or acquire new job tasks when their own jobs are not threatened" (quotation marks omitted)). But that is not the rule.

The *ILA* cases make clear that not all bargained-for work in a legitimate work preservation agreement must be work that was traditionally performed by that union's workers. *See id.* at 80–81 ("'Elimination' of work in the sense that it is made unnecessary by innovation is not of itself a reason to condemn work preservation agreements . . . to the contrary, such elimination provides the very premise for such agreements."); *ILA I*, 447 U.S. at 506 (doctrine applies "where unions attempt to accommodate change while preserving as much of their traditional work patterns as possible" (emphasis added)). To be sure, the acquisition of previously unperformed work may, in certain circumstances—for example, where union jobs have not been threatened, *see ILA II*, 473 U.S. at 75–76, or where that

work is markedly different from the union's traditional work, *see id.* at 81—suggest a secondary purpose.   The Board made no such finding here.   Rather, it made prior performance of electrical M&R work at Kinder Morgan's Vancouver facility a talisman, and in so doing, it eluded the "inferential and fact-based" inquiry that the doctrine requires. *See id.* at 81.

Simply put, the Board's narrow work preservation analysis is incompatible with the Supreme Court's holistic, circumstantial inquiry.   We therefore hold that the Board erred in finding the *ILA* cases inapplicable here and instead making past performance and extra-unit effects the beginning and end of its analysis.   The success of any work preservation defense here, however, depends upon one final, antecedent issue to which we now turn.

## B. The 2008 PCLCD Encompasses Electrical M&R Work

The Longshoremen's work preservation defense necessarily assumes that the disputed electrical M&R work is covered by the agreement it claims to defend.   Otherwise, its grievance actions and attempts to physically prevent Electrical Workers from performing electrical M&R work for Kinder Morgan lose their inference of a primary objective.   In its 10(k) decision, the Board concluded that the 2008 PCLCD does not encompass electrical M&R work because its terms are "very general" and contain "no explicit mention of electrical work." *IBEW*, 357 NLRB at 2219.   It also found that the 2008 changes to the PCLCD anticipating automation-related displacement "were directed at new work to be based on the introduction of new technologies." *Id.*   The Board then deferred to these findings without offering any additional analysis in its ULP order.   This, too, was error.

The Board and the intervenors overstate the deference owed to the Board's contract interpretations. "Although the Board has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication, the Board is neither the sole nor the primary source of authority in such matters." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202 (1991) (citation omitted); *accord NLRB v. Dist. Council of Iron Workers*, 124 F.3d 1094, 1098 (9th Cir. 1997) (de novo review of collective bargaining agreements). Courts and arbitrators fill that role. *Litton*, 501 U.S. at 202. We therefore owe no deference to the Board's construction of CBAs. *See Local Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1078 (9th Cir. 2008); *accord Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 373 (D.C. Cir. 2017) ("[W]e owe no deference to the Board's interpretation of a disputed collective bargaining agreement." (citation omitted)). We instead construe such agreements "according to ordinary principles of contract law" unless federal labor policy dictates otherwise. *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015).

As with all contracts, the intent of the parties is paramount. *Id.* And in this case, that inquiry begins and ends with the plain language of the 2008 PCLCD. *See id.* ("Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." (quotation marks omitted)).

Section 1.71 of the PCLCD provides, as it long has, that the agreement "shall apply to the maintenance and repair of all stevedore cargo handling equipment." Citing the parties' expectation of automation-induced displacement of traditional longshore work, however, the parties in 2008 added two new terms. The first (section 1.72) provides "that

the jurisdiction of the ILWU shall apply to the maintenance and repair of all present and forthcoming stevedore cargo handling equipment in accordance with Sections 1.7 and 1.71 and shall constitute the functional equivalent of such traditional ILWU work."   And the second (section 1.73) relevantly states that

> [t]he scope of work shall include . . . maintenance and repair . . . of all present and forthcoming technological equipment related to the operation of stevedore cargo handling equipment (which term includes containers and chassis) and its electronics, that are controlled or interchanged by PMA companies, in all West Coast ports.

Neither supports the Board's proscribed limitations.

*First*, neither term reinforces the Board's conclusion that the "contract language demonstrate[s] that the collective-bargaining agreement changes were directed at new work to be based on the introduction of new technologies." *See IBEW*, 357 NLRB at 2219.  The Board's analysis does not specify what language led to its "new work only" construction.  Meanwhile, the terms' application to "all present and forthcoming stevedore cargo handling equipment" and to "all present and forthcoming technological equipment related to the operation of stevedore cargo handling equipment" express a contrary intention.  Such language unambiguously encompasses both new and preexisting M&R work, and therefore, the parties' negotiations, post-agreement conduct, and industry customs bear no relevance to its meaning.  *See Pierce Cnty. Hotel Emps. & Rest. Emps. Health Tr. v. Elks Lodge*, 827 F.2d 1324, 1327 (9th Cir. 1987) ("Extrinsic evidence is

inadmissible to contradict a clear contract term." (citation omitted)).

*Second*, the Board was not free to ignore the plain meaning of the phrase "maintenance and repair of all stevedore cargo handling equipment" simply because such language is "very general." *See IBEW*, 357 NLRB at 2219. A contractual term bearing a broad general meaning is no more inherently ambiguous than a similarly sweeping statutory provision. *See Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 557 (9th Cir. 2016). In either case, mere generality tends to denote breadth, not ambiguity. *See id.* Neither the Board nor the intervenors point to a contractual provision suggesting an intent to limit the scope to mechanical M&R work. Nor do they explain how this more general language is inherently susceptible to conflicting meanings.

Regardless, the parties' inclusion of the phrase "and its electronics" in section 1.73 resolves whatever ambiguity the phrase "maintenance and repair of all stevedore cargo handling equipment" alone might have embodied—at least insofar as it concerns the inclusion of electrical M&R work. And it directly contradicts the Board's conclusion that the PCLCD omits an "explicit mention of electrical work." *See IBEW*, 357 NLRB at 2219. Neither the Board nor the intervenors suggest how work on the "electronics" of "all stevedore cargo handling equipment" might reasonably entail something other than electrical maintenance and repair work. As we see it, it is unlikely that it does. Thus, the Board again erred in looking outside the four corners of the 2008 PCLCD to inject ambiguity into this otherwise clear contract term. *See Pierce*, 827 F.2d at 1327.

*Third*, we conclude that the Board's view that section 1.72's functional equivalence clause pertains only to the

work previously encompassed by section 1.71 is untenable. This construction not only misreads section 1.72 and ignores section 1.73, but also renders the functional equivalence clause itself superfluous.

Read in relevant part, the functional equivalence clause of section 1.72 states "that the jurisdiction of the ILWU . . . shall constitute the functional equivalent of such traditional ILWU work."  The Board's attempt to anchor this language to section 1.72's intervening reference to section 1.71 ignores section 1.72's compound predicate structure.  The correct reading of the functional equivalence clause does not define the scope of work.  Section 1.73 does that.  The clause instead enshrines the parties' agreement that the scope of work included within the Longshoremen's jurisdiction will be considered the functional equivalent of its traditional work.

> More fundamentally, the Board's reading of the functional equivalence clause impermissibly renders sections 1.72 and 1.73 redundant.  *See Alday v. Raytheon Co.*, 693 F.3d 772, 784 (9th Cir. 2012) ("As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises." (quotation marks omitted)).  All parties agree that section 1.71 did not change in 2008.  However, if, as the Board suggests, section 1.72's functional equivalence clause only reiterates the scope of work covered by previous versions of the PCLCD, then the parties' addition of sections 1.72 and 1.73 in 2008 accomplished nothing.  The parties would have no need for a functional

equivalence clause if the 2008 PCLCD merely continued to encompass the same scope of work covered by previous versions. And likewise, the parties would have had no reason to add a term defining the scope of work if section 1.71 had already done so.

All told, the Board misconstrued the 2008 PCLCD in its 10(k) decision and, by extension, in its ULP order. The Board erred by consulting extrinsic evidence without first providing a legitimate basis for finding any of the relevant terms ambiguous. It then compounded that error by relying on such evidence to construe sections 1.72 and 1.73 in a manner that not only ignored their plain language, but also rendered much of their newly bargained-for provisions illusory. We hold that, subject only to exceptions not at issue here, the plain language of the 2008 PCLCD unambiguously assigns to the Longshoremen all M&R work, on all present and future stevedore cargo handling equipment—including its technological equipment and electronics—for all PMA members, at all West Coast ports.

## CONCLUSION

For these reasons, we conclude that the Board erred by according the findings in its 10(k) determination preclusive weight, by ignoring Supreme Court precedent in favor of an impermissibly narrow construction of the work preservation doctrine, and in construing the 2008 PCLCD as excluding the disputed work. We accordingly **GRANT** both petitions for review, **DENY** the cross-petition for enforcement, **VACATE** the Board's order, and **REMAND** for further proceedings consistent with this opinion.